# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                      Case No. 11-20129
                                             Case No. 11-20006

SCOTT WILLIAM SUTHERLAND ET AL.,

       Defendants.

_____/

## MEMORANDUM OPINION FURTHER ADDRESSING THE *FREEMAN* OBJECTIONS TO SPECIAL AGENT WILLIAM FLEMING'S OPINION TESTIMONY

During the course of this trial, Special Agent William Fleming has provided fact and opinion testimony pursuant to Rule 701. On October 22, 2014, defense counsel raised a foundational objection, based on their interpretation of *United States v. Freeman*, 730 F.3d 590 (6th Cir. 2013), to Special Agent William Fleming's testimony related to recordings of phone calls that were entered into evidence and played to the jury. (Dkt. # 1073, Pg. ID 6034.) On October 27, 2014, defense counsel asserted a continuing objection to Agent Fleming's opinion testimony related to the recordings. (Dkt. # 1075, Pg. ID 6673-74.) Defense counsel has raised additional *Freeman*-based objections to Agent Fleming's testimony throughout the trial. The court ruled on the objections and provided counsel with its reasoning for such rulings on the record. This memorandum opinion further explains the differences between improper testimony in *Freeman* and the testimony admitted in the instant case. Part I of this opinion analyzes *Freeman* and distinguishes Agent Fleming's testimony from the improper testimony in *Freeman* on the grounds that Agent Fleming's (1) was based on his personal knowledge

and (2) did not infringe on the role of the jury by offering conclusive interpretations of the recordings.  Part II reviews Agent Fleming's testimony related to audio recordings through November 17, 2014.

For the reasons stated on the record and discussed below, Agent Fleming's lay opinion testimony related to the recordings has been properly admitted.  His testimony is distinguishable from the improper testimony in *Freeman* because: (1) Agent Fleming's testimony is based on his personal knowledge; (2) the court has repeatedly instructed the jury that it is the jury's responsibility alone to draw conclusions about the meaning and significance of the recordings; and (3) the jury was informed of the bases for Agent Fleming's testimony, thus making it possible for the jury to evaluate the reliability of his testimony.

## I. The Dual Concerns of *Freeman*

A witness may provide opinion testimony under Rule 701, so long as the party seeking to admit the opinion testimony has established that the foundational requirements set forth in Rule 701 are met.  *Freeman*, 730 F.3d at 595-96.  Rule 701 provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.  "If a witness's testimony fails to meet any one of the three foundational requirements, it is not admissible."  *Freeman*, 730 F.3d at 596.

In *Freeman*, the Sixth Circuit held that a Federal Bureau of Investigation ("FBI")
agent's lay opinion testimony interpreting the meaning of recorded phone calls was
improper because (1) the prosecution did not establish a proper foundation for his
testimony under Federal Rule of Evidence 701 and (2) his testimony infringed on the
role of the jury by offering conclusive interpretations of the meaning of the recordings.
*Freeman*, 730 F.3d at 596-99.  In that case, a defendant convicted of conspiracy to use
interstate commerce facilities in the commission of murder for hire, 18 U.S.C. § 1958,
appealed from his conviction on the ground, *inter alia*, that the district court erred by
permitting FBI Special Agent Peter Lucas to provide lay testimony interpreting the
meaning of statements made during phone calls that were intercepted by the FBI and
played to the jury.  *Id.* at 592.  Agent Lucas's "testimony ranged from voice and
nickname identifications to substantive interpretations of the meaning of the various
statements."  *Id.* at 594.

The Sixth Circuit vacated the conviction after concluding that the prosecution did
not establish that the agent had sufficient personal knowledge for his opinion testimony
to meet the requirement set forth in Rule 701(a) because (1) the government conceded
at oral argument that the agent "lacked the first-hand knowledge required to lay a
sufficient foundation for his testimony under Rule 701(a);" (2) the agent "did not testify to
being present for the surveillance, or even to observing any activity relevant to
interpreting the calls;" and (3) the agent "never specified *personal* experiences that led
him to obtain his information, but instead, repeatedly relied on the general knowledge of
the FBI and the investigation as a whole."  *Id.* at 596-97.  The jury was, therefore, "left to

trust that he had some information . . . unknown to them . . . that made him better situated to interpret the words used in the calls than they were." *Id.* at 597.

The *Freeman* court also concluded that, by "dr[awing] conclusions from the phone calls the jury heard as well as from thousands of other phone calls and FBI evidence the jury had no access to . . . , [the agent] infringed upon the role of the jury to decide what to infer from the evidence, and instead told them what conclusions and inferences to draw." *Freeman*, 730 F.3d at 598. The court noted that Agent Lucas "effectively spoon-fed his interpretations of the phone calls and the government's theory of the case to the jury, interpreting even ordinary English language." *Id.* at 597.

Agent Fleming's testimony avoids both of the defects identified in *Freeman*. First, whereas in *Freeman* the government conceded that Agent Lucas lacked personal knowledge and the record was devoid of any "*personal* experience that led him to obtain his information," the record in the instant case establishes that Agent Fleming was significantly involved with the surveillance that produced the recordings as well as the underlying activities discussed in the recordings. Agent Fleming testified that he first became aware of the Devils Diciples' activities in 2004 through his communications with confidential informants (Dkt. # 1070, Pg. ID 5172); he has been serving as the case agent responsible for the overall investigation of the instant case against the Devils Diciples; and he participated in three controlled purchases of methamphetamine in this case (Dkt. # 1073, Pg. ID 5968), surveillance activities (Dkt. # 1076, Pg. ID 6878), and the execution of multiple search warrants of properties associated with the Devils Diciples. (*See* Dkt. # 1070, Pg. ID at 5187, 5194, 5198-99, 5249). Likewise, as

4

discussed below, Agent Fleming regularly provided additional testimony reaffirming the bases for his opinion testimony.

Second, the majority of Agent Fleming's testimony does not implicate *Freeman*'s "conclusive interpretation" defect because it offers the jury context for the recordings to aid the jury in drawing their own conclusions.  A minority of Agent Fleming's testimony concerns the meaning of particular phone calls.  Under an overly literal reading of *Freeman*, some of this testimony may be improper to the extent that it interprets the meaning of "ordinary language."  *Freeman*, 730 F.3d at 598 ("[A] case agent testifying as a lay witness may not explain to a jury what inferences to draw from recorded conversations involving ordinary language.")  However, the  "conclusive interpretation" defect is inextricably intertwined with the underlying foundational defect and flows directly from the fact that the *Freeman* jury was unable to evaluate the reliability of Agent Lucas's testimony because it had not been presented with the bases for his opinion.  Ignorant of the bases for Agent Lucas's testimony, the jury could not use the testimony as an aid in drawing its own conclusions about the recordings, *see* Fed. R. Evid. 701(b); rather, it was left to choose only between adopting his interpretation or ignoring it.  *See id.* ("[H]is testimony [was] no longer evidence but bec[ame] argument.") Furthermore, Agent Lucas "effectively told the jury that they were not as qualified as he to interpret the phone calls."  *Id.* at 598-99 (quoting the agent's testimony that it is "possible" that the jury could reach a different conclusion if they listened to all of the phone calls, but warning that, unlike his interpretations, the jury's interpretations "would not be based on 15 years of experience in the FBI").

5

The minority of Agent Fleming's testimony that interprets ordinary language contained in recordings is distinguishable from the improper testimony in *Freeman*. Whereas the jury in *Freeman* had no means to evaluate the testifying agent's opinion, Agent Fleming informed the jury as to the bases for his understanding of the recordings, which therefore permitted the jury the opportunity to evaluate his testimony and draw their own conclusions. Furthermore, the court instructed the jury multiple times that Agent's Fleming's opinions about the meanings of the recordings are merely his opinions, and it is the jury's responsibility to draw its own conclusions about what the recordings mean.[*1] In sum, Agent Fleming's testimony related to the recorded conversations in the instant case is distinguishable from the testimony provided by the agent in *Freeman* because Agent Fleming's testimony was based on his personal knowledge and perceptions, as required under Rule 701(a) and (c); it was offered to help aid the jury in drawing its own conclusion about the meaning of the recordings, as required under Rule 701(b); the jury is capable of evaluating the reliability of his testimony and drawing its own conclusion based on the evidence because it has been informed about the bases for Agent Fleming's opinions; and the court has repeatedly instructed the jury that it is the jury's role to draw conclusions about the meaning of the recordings.

---

[*] In order to enhance readability, this memorandum order utilizes endnotes instead of footnotes.

## II. Agent Fleming's Testimony

This Part discusses defense counsel's *Freeman* objections as they relate to Agent Fleming's specific testimony.  Section II.A recounts Agent Fleming's introductory foundational testimony; Section II.B addresses his testimony prior to defense counsel's *Freeman* objection; Section II.C reviews Agent Fleming's various testimony that provides helpful context to the recordings; and Section II.D covers his opinion testimony interpreting particular statements and conversations.

### A. Introductory Foundational Testimony

During Agent Fleming's direct examination, the government moved to admit, "based upon the understanding of all parties," audio recordings (Exhibits R-1 through R-12), a summary exhibit of the audio recordings (Exhibit R), wiretapped calls (Exhibits T-1 through T-333), a summary exhibit of the wiretapped calls (Exhibit T), and transcripts of the audio recordings and wiretapped calls (Exhibits R-1A through R-12A and T-1A through T-333A).[2]  (Dkt. # 1073, Pg. ID 5970-75.)  The government then solicited testimony from Agent Fleming about his personal knowledge of these recordings. Agent Fleming stated that he listened to all of the intercepted calls that were relevant to this case, (Dkt. # 1070, Pg. ID 5271) and he described the process he used to monitor one of the wiretapped phones:

> The phone is monitored by an agent. It comes up on a computer screen when either there's an incoming call or Mr. Darrah makes an outgoing call. It tells you what phone number he's, he's calling or is calling him. You then can listen for an initial two-minute period. If after two minutes, you realize that the call is not related to criminal activity, we hit a button that minimizes or turns off the recording that we then can listen to.

If, after two minutes, we make a determination that the call is criminal in nature, we can continue to listen for the call -- to the call. But if, later on in that call, it becomes non-criminal, we then minimize it again, which does not allow us to hear what's going on.

(Dkt. # 1070, Pg. ID 5271-72.)[3]

Agent Fleming also provided testimony about the nature of the non-wiretap audio recordings. He stated that Exhibit R-2 is a recording made during a controlled buy on August 4, 2007 (Dkt. # 1073, Pg. ID 5978), Exhibit R-3 is a telephone conversation that occurred while agents were present with a cooperating call participant (*Id.* at 5980), and Exhibit R-5 was a recording of a Devils Diciples "church meeting" on October 3, 2007. (*Id.* at 5982.) He further provided an in-depth description of his personal involvement in obtaining and surveying Exhibit R-5.[4] Throughout the course of trial, the government has solicited additional foundational testimony to demonstrate Agent Fleming's personal knowledge when necessary. This additional foundational testimony is discussed below.

### B. Testimony Prior to Defense Counsel's Freeman Objection

#### i. Testimony about Exhibit R-5 and the False Tailpipe

After testifying to his personal knowledge of the recordings and wiretapped phone calls, Agent Fleming testified about the content of some of the recordings. First, he testified that he selected two portions of Exhibit R-5 for trial: a "portion where Mr. Rich and Mr. Pizzuti discuss the future purchase of methamphetamine" and "a portion of the meeting with Mr. Smith, Mr. Darrah and other members of the Devils Diciples." (Dkt. # 1073, Pg. ID 5984-85.) Regarding the portion involving Vern Rich, Agent Fleming stated: "Well, there's two main things, both associated with the purchase of methamphetamine. First, Mr. Pizzuti is trying to determine if Mr. Rich is ready, meaning

8

does he have methamphetamine to purchase.  Mr. Rich says that he's low, but that he had just given $60,000 to someone to re-up, which means to replenish his supply of methamphetamine." (*Id.* at 5985.)  The government then inquired about an exhaust pipe mentioned during the recording.  Agent Fleming explained, "Mr. Rich, during this conversation with Mr. Pizzuti, advised that he had a false tailpipe on his motorcycle that he used to transport, in this particular case, money." (*Id.*)

Defense counsel objected to Agent Fleming's summarizing of the recording and suggested that the government play the tape instead.  (Dkt. # 1073, Pg. ID 5985.)  The government responded that, "because of the length of this particular recording, and the way in which the recording is so rapid, [the purpose of Agent Fleming's testimony is] to give context and make it less confusing for the jury when they hear it." (Dkt. # 1073, Pg. ID 5985.)  The court overruled the objection finding that defense counsel's concerns would be addressed in the course of the testimony. (Dkt. # 1073, Pg. ID 5986.) Following the objection, Agent Fleming proceeded to testify as to the significance of the tailpipe, stating, "The significance was, it was used to transport large amounts of money and large amounts of methamphetamine, as a way to disguise it or to deter law enforcement from finding it." (Dkt. # 1073, Pg. ID 5987.)

In *Freeman*, the jury was asked to rely on the agent's opinion without being presented with the evidence on which the agent based his opinion; meanwhile, here, the jury was presented with all of the necessary evidence to evaluate the reliability of Agent Fleming's testimony and to draw its own conclusions about the content of the recording.[5]

### ii. Testimony to which Counsel Did Not Object

9

After the court overruled defense counsel's initial objection to Agent Fleming's testimony summarizing Exhibit R-5 instead of playing the recording, the government played a number of recordings—including Exhibit R-5—to the jury, and Agent Fleming testified as to his opinion about the content of the recordings.[6]  Defense counsel did not object to any of this testimony.  Only after Agent Fleming had concluded his testimony about the recordings cited in Footnote 6 and after he had been subject to cross examination, defense counsel for Vincent Witort "object[ed] to the continued testimony of Officer Fleming as it relates to his giving his opinion after interpreting the phone calls" based on *Freeman*.  (Dkt. # 1073, Pg. ID 6034.)  The government interpreted the objection as an oral motion to strike Agent Fleming's testimony (*see* Dkt. # 1074, Pg. ID 6182) and filed a response on October 23, 2014. (Dkt. # 1053, Pg. ID 5146.)  Defendant Witort filed a reply on October 27, 2014 (Dkt. # 1061, Pg. ID 5227), and the government and Witort's counsel orally provided their interpretations of *Freeman* and its application to Agent Fleming's testimony during trial.  (Dkt. # 1075, Pg. ID 6663-77.)

The court denied Witort's motion to strike, in part, because Witort's counsel did not raise a timely objection to Agent Fleming's testimony.  (Dkt. # 1075 6670, 6677.)  Pursuant to Federal Rule of Evidence 103(a), "[a] party may claim error in a ruling to admit or exclude evidence *only* if the error affects a substantial right of the party and: (1) if the ruling admits evidence, a party, or the record: (A) *timely objects or moves to strike*; and (B) states the specific ground, unless it was apparent from the context . . . ."  Fed. R. Evid. 103(a) (emphasis added).  "As a matter of policy, the objection requirement of Fed. R. Evid. 103 is intended to allow the trial court to fix errors in its decision to admit or exclude evidence on the spot, thus preventing errors that could easily be alleviated

10

without recourse to the appellate courts." *Gates v. City of Memphis*, 210 F.3d 371 (6th Cir. 2000). The court had no opportunity to consider whether the testimony summarized in Footnote 6 was proper before it was presented to the jury because defense counsel did not object to the testimony. Moreover, even if some of Agent Fleming's initial testimony interpreting recordings raised the concerns discussed in *Freeman*, such concerns would be minimized by the court's repeated instructions to the jury to draw its own conclusions based on the evidence and by Agent Fleming's well-documented personal knowledge of the audio recordings and their underlying activities.

After the court denied Witort's motion to strike, his counsel asserted a "continuing objection to Mr. Fleming's testimony regarding his lay opinion of phone calls." (Dkt. # 1075, Pg. ID 6674.)

### C. Testimony Providing Context

Over the course of trial, Agent Fleming has continued to provide testimony to assist the jury in understanding the recordings. Most of his testimony was offered to provide context about the recordings to make them easier for the jury to understand. This contextual testimony was based on Agent Fleming's personal review of the recordings and his hands-on role in the investigation, and it does not implicate the concern expressed in *Freeman* of hijacking the fact-finding role reserved for the jury. The contextual testimony includes (1) background testimony about the time and participants of the wiretapped phone calls, as well as background testimony about activities related to the recordings; (2) testimony about Devils Diciples' members referenced in the recordings, such as nicknames, given names, whether individuals

were members of motorcycle clubs, and the meaning of certain Devils Diciples terms;
and (3) the FBI's activities in response to hearing the recordings.

### i. Background Testimony about the Wiretapped Phone Calls

First, much of Agent Flemings commentary about the recordings was about the
date, time, and participants of the phone calls (*see, e.g.*, Dkt. # 1076, Pg. ID 6846-47,
6849); whether particular recordings occurred in close temporal proximity to other
recordings published to the jury (*see, e.g.*, *id.* at 6848, 6850-51, 6854); and background
events related to the recordings. (Jury Trial, Volume XV at 99.) When identifying the
participants of certain phone calls, Agent Fleming testified regarding his personal
knowledge about the identity of the voices on the recordings.[7] (Dkt. # 1076, Pg. ID
6838-42.) Likewise, before playing calls related to the Next of Kin, Agent Fleming
testified that "Next of Kin was a riding club or an RC that wanted to become an MC or a
motorcycle club. And there was a certain process they had to follow to become an MC."
(Jury Trial, Volume XV at 99.) After playing the recordings related the Next of Kin's
efforts to become a motorcycle club, he testified that at some point after the recordings,
the Next of Kin received an MC patch, "[b]ut shortly after they put the MC patch on, they
were patched over by the Vigilantes and NOK didn't exist anymore." (Jury Trial, Volume
XV at 113.)

### ii. Testimony about Individuals and Terms

Second, Agent Fleming's testimony provided context to the recordings by
informing the jury of his understanding of particular names and words, based on his
personal knowledge of the Devils Diciples. For example, Agent Fleming testified that

"Barnyard" is the nickname of Paul Liss who is a member of a different motorcycle club (Dkt. # 1076, Pg. ID 6855) and "Little Jon or Lil Jon" is the nickname of Jonathan Chillingworth of the Devils Diciples California branch.  (*Id.* at 6856.; *see also id.* at 6860, 686-66 (identifying other members of the Devils Diciples).)  He also testified that the term "Sportster" is a type of Harley Davidson motorcycle  (*id.* at 6863) and that "Scooter's old lady bar" refers to "the Lighthouse bar."  (Jury Trial, Volume XV at 101.)

As discussed above, the government solicited testimony about Agent Fleming's role in the investigation of the Devils Diciples and other motorcycle clubs that establishes how he has personal knowledge of the club's members and lingo.  In some instances, the government solicited additional foundational testimony from Agent Fleming.  For example, before testifying that a "DD ring"—which was referenced in Exhibit T-254—is "a ring that's presented to members based upon longevity in the [club]," Agent Fleming testified that he is familiar with DD rings because "[w]e've seized several of the DD rings.  We've also seized paperwork related to the purchase of those rings."  (Dkt. # 1076, Pg. ID 6843.)

When necessary, the court has directed the government to solicit additional foundation to demonstrate that Agent Fleming had the personal knowledge required under Rule 701 to provide testimony about the identity and role of individuals discussed in the recorded calls.  For example, after playing Exhibit T-328 to the jury, the government asked Agent Fleming if he was familiar with an individual discussed in the recording as "SA."  (Dkt. # 1076, Pg. ID 6871.)  Agent Fleming identified "SA" as Smiley Villa.  (*Id.*)  The government asked if SA was a member of the Devils Diciples or a different organization.  (*Id.* at 6871-72.)  Defense counsel objected, and the court

13

requested additional foundation.  Agent Fleming then testified that there are wiretap

calls that will be played to the jury in which individuals discuss SA's participation in a

motorcycle club and he has spoken with individuals who will be testifying at this trial

about SA's membership in a particular motorcycle club.[8]  (*Id.* at 6872-73.)

When the government was unable to establish a proper foundation for Agent

Fleming's testimony, the court sustained defense counsel's objection.  (*See* Jury Trial,

Volume XI at 307 (concluding that sufficient foundation had not been laid for Agent

Fleming's testimony about the meaning of "33").)

### iii. Testimony about the FBI's Activities

Third, Agent Fleming's testimony about the recordings provided helpful context

by addressing the FBI's responses to hearing the recordings, and thus assisting the jury

in determining how the recordings relate to other evidence presented at trial.  This

testimony is distinguishable from the improper testimony in *Freeman* because it

concerns the FBI's investigative activities, not the content of the phone calls.

For example, after the government published Exhibit T-260 to the jury, it solicited

the following testimony from Agent Fleming:

> Q. . . . [D]o you as an investigator involved in listening to these calls have any
> concerns about any sort of threats against Mr. Burby at this point?
>
> A. Well, it's clear reviewing the calls they are not very happy with Mr. Burby.
> They are not very happy with the fact that Michelle Richards is putting club
> information out there to non-club members.
>
> Q. And so as an investigator involved in real-time listening to these calls,
> what do you do? What steps do you take?
>
> A. Well, eventually, we go out and talk to Mr. Burby and let him know about
> threats against him, but not initially at this point.

14

Q. So initially, at this point, do you have concerns or elevated concerns or just sort of in the background?

A. Well, we have concerns. We're listening to the phone calls, but we have to balance that with our ongoing investigation. It didn't appear, at least initially, that it was going anywhere other than talk at first.

Q. All right. Did there come a time where that feeling changed, as an investigator?

A. It did, yes.

(Dkt. # 1076, Pg. ID 6844-45.)

Similarly, after playing a number of recordings to the jury, the government

engaged in the following dialogue with Agent Fleming to place the phone calls in

context with the other components of the FBI's investigation:

Q. Now, Special Agent Fleming, the calls that we've played so far, would you describe them as relating mostly to Mr. Burby?

A. That's correct.

Q. Now, from an investigative point of view, when you're listening to these calls in real time, is there a progression of sorts from the beginning of the calls we played until the call that we're at right now? What are you, what are you interpreting from an investigative standpoint? What is your next step?

A. Well, it's clear that they feel that Mr. Burby had something to do with the search warrants that we conducted on September 23rd of 2008. At this point, we are just monitoring the Title III to see what information we can learn about that.

Q. And that's something that's done on an ongoing basis, in real time?

A. That's correct.

Q. Now, at this point, as of September 23rd of 2008, have you had any interviews of Mr. Burby regarding any of the activities that we've been talking about during the course of these few weeks in the wiretap?

15

A. Not regarding, no, not regarding the substance of these Title III phone calls, no.

Q. Is he a cooperator at this point?

A. He is not.

. . .

Q. So when these calls are being monitored in real time, and there's talk about Mr. Burby being a snitch, is that, in fact, not accurate from an investigative standpoint?

A. No. He was not an informant for the FBI.

(Dkt. # 1076, Pg. ID 6868-70.)

### D. Opinion Testimony about the Content of Recordings

Last, Agent Fleming testified about his opinion of the meaning of certain conversations and statements in the recordings.  As discussed in Part I, this testimony is distinguishable from the improper testimony in  *Freeman* because (1) it is based on personal knowledge; (2) the court instructed the jury that it is the jury's responsibility alone to draw conclusions about the meaning and significance of the recordings; and (3) the jury was informed of the bases for Agent Fleming's testimony, making it possible for the jury to evaluate the reliability of his testimony.

Additionally, *Freeman*'s holding prohibiting unfounded lay testimony opining about the meaning of recorded conversations only concerns conversations involving "ordinary language."  The *Freeman* court approvingly cited to the concurring opinion in *United States v. Hampton*, 718 F.3d 978 (D.C. Cir. 2013) (Brown, J., concurring), in which Judge Brown found problematic an FBI agent's testimony about "the meaning of ordinary—albeit cryptic—recorded language," but clarified that "a lay witness with

16

personal knowledge of a particular drug conspiracy may testify on the meaning of coded

language specific to that conspiracy." *Id.* at 985. To the extent that Agent Fleming's

testimony about the meaning of certain recordings involves the interpretation of "coded

language" instead of ordinary language, *Freeman* would not be implicated.

Below are summaries of Agent Fleming's testimony about his opinion of the

meaning of certain recordings that arguably involve the interpretation of "ordinary

language":

- Agent Fleming testified that a number of recordings were related to Vicodin. (Jury Trial, Volume XVI at 216-40; Jury Trial, Volume XVII at 9-21.) Likewise, he testified that the phrase "getting them out" as used in the wiretapped calls "means Mr. Darrah has a prescription of Vicodin to pick up at the pharmacy"[9] (Jury Trial, Volume XVI at 230.)

- After playing Exhibit T-321 to the jury, the government asked Agent Fleming if he had an understanding of the meaning of the phrase "I gave you the key to that house," as used in the recording, "based upon [his] interviews of individuals in this particular case." (Dkt. # 1076, Pg. ID 6866-67.) Agent Fleming responded, "Mr. Vandiver was given a key to the Blue Water clubhouse by Mr. Darrah." (*Id.* at 6867.) He then testified that "Mr. Vanvider and Ms. Franks were making meth at the Blue Water clubhouse." (*Id.* at 6868.)

- Agent Fleming testified that his understand of the phrase "being done" as used in Exhibit T-291 meant "[o]ut of the club, leaving the club." (Dkt. # 1076, Pg. ID 6855.)

- Before the government played a series of recordings to the jury, Agent Fleming testified that "[i]t's a series of calls between Mr. Darrah and Bob Mickelson, who goes by Biker Bob, regarding a Devils Diciple Raymond Melioli, who went by 'Romeo,' and the fact that Mr. Melioli was being disorderly." (Jury Trial, Volume XV at 114.)

- The government asked Agent Fleming about his understanding of Wayne Werth's comment, in Exhibit R-11, "Did you ever tell Ronnie that, to keep an eye on him?" (Jury Trial, Volume XV at 83, 86.) Agent Fleming answered that he understood the reference to

"keep[ing] an eye on him" to be "talking about Ronald Roberts keeping an eye on Christopher Cook."  (Jury Trial, Volume XV at 88.)[10]

Below are summaries of Agent Fleming's testimony about his opinion of the meaning of "coded language":

- Agent Fleming testified that the phrase "getting your eye dotted" "means to punch somebody in the eye." (Dkt. # 1076, Pg. ID 6877.)

- After playing Exhibit T-287 to the jury, the government established that Agent Fleming had heard the phrase "bring all his shit" during his interviews with Danny Burby and other members of the Devils Diciples. (Dkt. # 1076, Pg. ID 5860.)  Agent Fleming then testified that he understands this phrase to be used "for a member who is leaving the club in bad standing, meaning they have to bring back all of their Devils Diciples stuff and their motorcycle and give it to the club."  (*Id.* 6851.)

- He testified that the word "vikes," as used in Exhibit T-270, is "a street word for Vicodin."[11]  (Jury Trial, Volume XVII at 40.)

### III. Conclusion

Agent Fleming's testimony related to the recordings is distinguishable from the improper testimony in *Freeman* and admissible under Rule 701.  Accordingly,

IT IS ORDERED that Agent Fleming's testimony is admitted subject to the limitations and rulings as explained on the record and in this opinion.

s/ Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  December 22, 2014

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, December 22, 2014, by electronic and/or ordinary mail.

S/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

---

1. The court provided the jury with the following instructions regarding Agent Fleming's testimony:

> I'll probably repeat my concluding instructions maybe a few more times during the trial.  But the testimony of Agent Fleming testifies in the past, or will testify now I think about certain facts, certain things that happened, as well as providing certain opinions. One example of that is what does the letter "CI" stand for; that's jargon inside the law enforcement community, confidential informant. So some of this testimony is in the form of opinions or conclusions that the witness says that he draws from various kinds of evidence that he's examined, things that he's become aware of. These are two different kinds of testimony, fact testimony and opinion testimony. In

terms of the testimony on facts, just like any other witness, you should consider the ordinary factors that I talked with you about very, very briefly at the beginning of the case for considering the reliability of fact witnesses, consider such things as the witness's -- and this applies not to just this witness, all witnesses who testify about facts, the witnesses earlier today included. Consider things like the witness's ability to see and to remember the facts; the quality of the memory the witness had; whether there was anything else that interfered with the witness's memory; how the witness acted while testifying. If he or she had anything to gain or lose that might influence the witness's testimony. If a witness had any apparent bias, prejudice, reason for testifying, that might influence the witness. And if the witness testified perhaps inconsistently from time to time, those are all ordinary things that the jury would consider in evaluating fact witnesses. Now, as to the testimony of Agent Fleming or anybody else that might offer opinions based upon the witness's review of what may be perhaps voluminous or complex facts, please bear in mind that you do not have to accept Agent Fleming's opinions or conclusions that he draws from other facts. They are his interpretation. Similar, actually, to the interpretation that's provided to the jury, to all juries frequently, by way of transcripts of recordings. The recording is the evidence. The transcript is an interpretation that's presented to assist the jury in that regard. So in deciding how much weight or how much substance to give Agent Fleming's opinions or interpretations, you should consider, among other things, how he reached his conclusions, along with other factors described for weighing the credibility of the witnesses, the reliability of the testimony provided such witnesses. And again, ultimately remember that it's you alone, it's the jury alone that decides how much of a witness's testimony to believe, how reliable that, that witness is deemed to be, and how much weight that testimony deserves.

(Dkt. # 1075, Pg. ID 6744-46.)

Later during the trial, after Agent Fleming testified that he understood a particular recording to be related to Vicodin, the court reemphasized:

That sort of comment . . . is ultimately a conclusion to be drawn by the jury, whether the conversation did, in fact, involve drug-seeking or drug transactions or other behaviors. That's a conclusion that only the jury can draw. The witness is suggesting that, from his review, apparently, of the evidence that it is oriented in that way. But that's, that's just a -- that I take as nothing more, and the jury should take as nothing more than a suggestion of the content of this conversation. Again, it is the jury's determination that counts with respect to whether this conversation relates to what the Government suggests it does. You may proceed with it on that basis and with that sort of cautionary instruction, not specifically requested, but I think

appropriately given.

(Jury Trial, Volume XVI at 218-19.)

Similarly, when defense counsel objected to Agent Fleming's testimony that Exhibit T-311 "related to the manufacturing of methamphetamine involving Mr. Vandiver and Mr. McGowan" (July Trial, Volume XI at 43), the court noted that the foundation for this testimony was Agent Fleming's discussions with Jaime Frank and restated that:

> Obviously, the conclusion is up to the jury as to whether these things do or do not relate and how they relate and what significance they have. But at least for the purpose of orienting the jury, for the purpose of playing the stipulated sound recordings, that statement is, in my view, unobjectionable. It's not introduced in order to assert the truth of the matter, but more to orient the parties and the jury, in my opinion. And on that basis and with that limitation, you can proceed.

(Jury Trial, Volume XI at 43.)  Defense counsel then objected to this testimony as to relevancy.  The court explained why the testimony was relevant, and reiterated, "Once again, the ultimate -- the significance of these things is completely up to the jury, not up to any particular witness to assert.  (Jury Trial, Volume XI at 44-46.)

The court also reinforced that it was the responsibility of the jury—not Agent Fleming—to determine the meaning of the recordings when defense counsel objected to Agent Fleming testimony that Exhibit T-321 related to the arrest of Jaime Franks and Cary Vandiver:

> I'm going to overrule the objection. Once again, reminding the jury that whether any such matters, in fact, are related, whether they are preceding or simultaneous with or after an event in question is entirely up to the jury. The jury will find the facts. The witness may state impressions, based upon his examination and fairly extensive knowledge of the, of the evidence gathered and the contents of tape recordings that have been made and are being offered for the jury. The witness may state his impression as to how these things, he suggests, are related. But the ultimate determination is absolutely up to the jury, irrespective of what this or any witness may state or what an attorney may argue.

(Jury Trial, Volume XI at 47-48.)

2. The transcripts were not admitted as substantive exhibits; they were admitted as aids in the understanding of the recorded conversations.  (Dkt. # 1073, Pg. ID 5973.)

3. At another point during trial, the government solicited additional testimony about Agent Fleming's personal knowledge of the phone calls.  Agent Fleming testified that he

listened to the intercepted phone calls over the course of the wiretap and "reviewed all of the calls [in connection with Paul Darrah's wiretap] at least once, some of the calls multiple times" prior to testifying. (Dkt. # 1076, Pg. ID 6835.)  He testified that he had an opportunity to familiarize himself with the voices heard during the course of the wiretap "[t]hrough either previous contact with some of them; through the subscriber information for the telephone that was intercepted, it would come back to a particular person and through the investigation of this case." (Dkt. # 1076, Pg. ID 6845.)  Agent Fleming also listened to "many" phone calls in which the caller identified himself or herself, and he had personal contact with many of the individuals recorded by the wiretaps. (Dkt. # 1076, Pg. ID 6836-37.)

4. Agent Fleming stated, "[a]t the beginning or prior to the meeting, Mr. Rich and Mr. Pizzuti met, discussed a purchase, a future purchase of methamphetamine and what the price was going to be.  And then Mr. Pizzuti went to the actual meeting that was run by Mr. Smith and Mr. Darrah." (*Id.* at 5982.)  After being advised by Pizzuti that the meeting was going to take place, "[j]ust like any other meeting, we prepared a recording device.  We obtained the funds for the purchase of meth, if there was going to be one, which I don't believe there wasn't one that particular day.  Activated the recording device, followed him to the location, watched him go in, and then drove away." (Dkt. # 1073, Pg. ID 5983.)

5. Later during the trial, Agent Fleming testified that he conducted a search of Rich's home on November 15, 2007 during which the FBI found the tailpipe discussed in the recording. (Jury Trial, Volume XI at 301.)  The government introduced Exhibit 35-12, and Agent Fleming testified that it "is the tailpipe that was removed from Vern Rich's motorcycle and it also includes a plug that was found inside the tailpipe." (*Id.* at 301.)  Agent Fleming provided further testimony related to how he developed his opinion that Exhibit 35-12 was a "fake" tailpipe, stating: "We had received information from sources that Mr. Rich was using a fake tailpipe to transport money and meth;" (*Id.* at 302) "it had a plug inside of it that wouldn't have allowed exhaust to run through it and probably would have been a problem for the engine;" (*Id.* at 303); "[a]nd since it was plugged and couldn't operate as a tailpipe, the other one was open, we believe this was the one that he was using." (Jury Trial, Volume XI at 303.)  Last, the government also introduced as Exhibit 35-49 photograph of Vern's motorcycle with Exhibit 35-12 attached to it.  (Jury Trial, Volume XIV at 307-08.)

6. (*See, e.g.,* Dkt. # 1073 at 5989 (testifying that the first portion of Exhibit R-5 "was the discussion between the three of them of the purchase of methamphetamine"); *id.* at 5992-93 (testifying as to the meaning of the recording's reference to "taking someone's center wheel:" "The center wheel is an indication of full membership.  Oftentimes, if you're punished, your center wheel is taken, and you become a prospect again."); *id.* at 5992-93 (stating that there is a Devils Diciples club in Arizona, "Swede" is a member of the Devils Diciples branch in Illinois, Devils Diciples' "church meetings" were held weekly by some chapters and a couple times a month by other chapters); *id.* at 5996

(interpreting Vern Rich's statement in Exhibit T-322 that "it's here now" to mean "Mr. Rich is telling [John] Pizzuti [who was cooperating with the police] that he got a new shipment of methamphetamine that he has, and is willing to sell it"); *id.* at 5997 (opining that Exhibit T-33 is significant because in "[t]his conversation, Mr. Rich is telling Mr. Riede that he's trying to make a sale of methamphetamine and that he wants to get the money to Mr. Riede before he leaves"); *id.* at 5998 (interpreting the discussion in Exhibit T-28 of "JP owing Vern some money" as follows: "What they are talking about is Mr. Darrah needs money or would like some money. Mr. Rich lets him know that he's about to meet up with JP, clearly, to sell meth; and that some of that money could go to Mr. Darrah for gas to -- I believe he was going to a hospital to visit someone who was ill."); *id.* at 6001-02 (describing Exhibit T-51 as follows: "Mr. Rich is telling Mr. Riede that he's got a lot of money. When he uses the term, he wants to get this out of his pocket, he's got a lot of money that he wants to get to Mr. Riede. And in the same token, when he says he probably wants to do that, do that again, meaning he needs to refresh his supply of methamphetamine that he can get from Mr. Riede. So he can kill two birds with one stone. If they meet, he can give him the money that he's got that he owes Mr. Riede for methamphetamine. In return, Mr. Riede can give him additional methamphetamine. Mr. Riede says, 'things are real right,' meaning he's fresh with methamphetamine and they can kill two birds with one stone."); *id.* at 6003 (testifying to his opinion about the purpose of the communication in Exhibit T-52: "Mr. Pizzuti was just telling Mr. Rich that he wasn't available to do the deal that night. And Mr. Rich lets him know that he's going to see that other guy, meaning Mr. Riede, and then after, any time after that they can get together and do the deal."); *id.* at 6003-05 (stating that the "deal" discussed in Exhibit T-52 occurred the following day, describing Pizzuti's efforts to postpone the transaction until later in the day because he did not have the recording device or money when Rich wanted to "do the deal" earlier in the day, and describing his surveillance of Pizzuti during the deal itself ); *id.* at 6008 (interpreting the conversations in Exhibit T-55 as follows: "Mr. Rich confirms that he did a meth deal; that he's got a lot of money to give Mr. Riede, triple what he gave him the day before. And he believes that by the time he's done, he'll have at least seven, meaning $7,000, to give to him") *id.* at 6008-09 (providing background information about Devils Diciples members referenced in the call, such as identifying "Hombre" as Allen Paille and testifying that Paille has a history with methamphetamine, served prison for distributing methamphetamine, and is a longtime member of the Devils Diciples).)

7. Agent Fleming testified that he was familiar with Jeff Smith's voice "[t]hrough listening to the calls off this wire, and listening to his voice on other recordings" (*id.* at 6838); Paul Darrah's and Cary Vandiver's voices "from dealing with them, listening to other recordings, and listening to the wiretap," (*id.* at 6840); Gary Nelson's voice "from listening to the Title III and conversations with him" (*id.* at 6842); Shane Dinger from recorded conversations "on the Vern Rich wire[] and interviewing Mr. Dinger" (*id.* at 6853); Tim Downs' voice "[t]hrough listening to other calls on the Title III and actually talking to Mr. Downs" (*id.* at 6857); and Jeff Fetty's voice "through the subscriber information to the call." (*Id.* at 6859).

8. Defense counsel also objected to questions about Agent Fleming's understanding of who the president of the Next of Kin Motocycle Club was in September 2008. (Dkt. # 1076, Pg. ID 6875.) Agent Fleming testified that his review of phone calls that will be played to the jury as well as his interviews of Scott Perkins, Smiley Villa, and others serve as the basis for his understanding of the identity of the president in September 2008. (*Id.* at 6875- 76.) Based on this testimony, the court overruled the objection, and Agent Fleming identified the president of the Next of Kin Motorcycle Club in September 2008 as Mark Wenglascz. (*Id.*)

9. In addition to the previous testimony about his first-hand knowledge of the recordings, the Devils Diciples, and the investigation into the Devils Diciples, there was substantial additional testimony and evidence providing the basis for Agent Fleming's testimony about the meaning of these recordings. Agent Fleming stated that his opinion was based on records he obtained from the Michigan Automated Prescription System ("MAPS")—"a system that law enforcement can use to query if a person has picked up narcotic-related prescriptions or pain medication." (*Id.* at 230-31.) During the following day of trial, the government admitted into evidence Exhibits 4-4 and 4-7 and a stipulation that those exhibits are records obtained from MAPS. (Jury Trial, Volume XVII at 21-23.) Agent Fleming testified that "Government's Exhibit 4-4 is the MAPS report that we received from MAPS regarding Mr. Darrah and prescriptions for controlled substances" (*id.* at 23), and that "Government's Exhibit 4-7 is a spreadsheet that was prepared by an FBI analyst that just breaks out the Vicodin or hydrocodone purchases by Mr. Darrah by date, when a prescription was filled, the quantity, which doctor, things along that -- those lines." (*Id.* at 24.) According to Agent Fleming, the MAPS reports reflect that Darrah purchased 10,200 Vicodin pills between October 2003 and February 2008. (*Id.*) Agent Fleming also testified that "[t]here were empty bottles that had Vicodin tickers on them, or prescription stickers for hydrocodone . . . , empty bottles with nothing in them . . . , [and] bottles that had some Vicodin in them" seized in connection with the search warrants discussed during trial. (*Id.* at 25-26.) The government then admitted into evidence Exhibits 35-1, 35-3, 35-4, and 35-7, which Agent Fleming testified are Vicodin pills found at Mr. Rich's house during a search; Exhibit 35-6, which Agent Fleming testified is a "hyrocodone bottle with the prescription of Paul Darrah on it . . . found during the search of Vern Rich's house;" Exhibit 34-8, which Agent Fleming testified "is an empty pill bottle and Vicodins that were recovered from Mr. Riede's house during a search warrant;" Exhibit 42-1, which Agent Fleming testified were five empty bottles of Vicodin found at Darrah's house including four with prescription labels to Darrah; Exhibit 42-2, which Agent Fleming testified "is another Vicodin pill bottle that contains three Vicodin in Mr. Darrah's name;" Exhibit 42-2, which Agent Fleming testified is "an empty bottle of codeine in Mr. Darrah's name;" Exhibit 43-1, which Agent Fleming testified "is a bottle of Vicodin that was located at Mr. Morocco's house" Exhibit 49-1, which Agent Fleming testified "is a Vicodin that was located inside a Tylenol bottle" found at Tagliavia's house; and Exhibit 49-2, which Agent Fleming testified was a pill—but not Vicodin—found at Tagliavia's house. (*Id.* at 26, 28-30, 37- 39.) The government also entered into evidence photographs that, according to Agent

Fleming's testimony, depicted various bottles of Vicodin, hydrocodone, and codeine connected to Darrah.  (*Id.* at 35-36.)  Accordingly, the jury was presented with a substantial amount of evidence and testimony which it could use to discerningly evaluate the reliability of Agent Fleming's opinion testimony and ultimately draw its own conclusions about the meaning of the recordings.

10. Agent Fleming's testimony about Exhibit R-11 was subject to other objections, as well.  Defense counsel objected to the relevance of Exhibit R-11 because it was offered as relevant to Danny Burby but did not mention Burby.  (Jury Trial, Volume XV at 83.)  The government asked Agent Fleming to identify the reference to Burby in his opinion, and defense counsel again objected, arguing that his "interpretation is relying on his opinion of something that is not on the tape and displayed on the screen." (*Id.* at 83-84.)  The court overruled the objection.  (*Id.* at 85.)  Next, defense counsel objected to Agent Fleming's testimony about the meaning Werth's statement excerpted in the above text.   The court overruled the objection, too.  Last, the government asked, "And when Mr. Werth was talking about, 'He's the only one that night, you know what I mean, you know that he was fucking scared about,' based upon, again, all of your investigation into this particular conversations with Mr. Burby and others, what is he referring to in that particular portion of the call, 'that night'?"  (Jury Trial, Volume XV at 88.)  Defense counsel objected and the objection was overruled, but Agent Fleming did not answer the question.  (*Id.* at 88-89.)  At this point, defense counsel requested a standing objection "[t]o relevancy, 701, and hearsay."  (*Id.* at 90.)

11. Testimony interpreting the meaning of drug slang is typically provided as expert testimony.  *See, e.g., Freeman*, 730 F.3d at 598 ("An agent qualified as an expert may interpret coded drug language . . . ."); *United States v. Daniels*, 951 F.2d 350, at *3 (6th Cir. 1991) (unpublished table disposition) ("The district court did not abuse its discretion . . . by allowing [an] undercover agent . . .  to testify as an expert on coded drug terminology . . . .").  However, the government asked Agent Fleming to provide this testimony "based upon the totality of the calls that we've heard."  (Jury Trial, Volume XVII at 40.)  Thus, this testimony was based on his personal knowledge and not on his expertise and, therefore, may be given pursuant to Rule 701.