# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                            Criminal No. 11-20129
                                                                  Criminal No. 11-20066

PATRICK MICHAEL McKEOUN, et al.,

    Defendants.
                                       /

## ORDER RESOLVING COMMON OBJECTIONS FOR TRIAL DEFENDANTS

On October 16, 2017, the court issued an order resolving general sentencing issues of law as to the following Defendants in this matter, all of whom proceeded to trial and were found guilty on various counts: Patrick Michael McKeoun, Jeff Garvin Smith, Paul Anthony Darrah, Cary Dale Vandiver, Vincent John Witort, David Randy Drozdowski, Victor Carlos Castano, Michael Kenneth Rich (collectively, "Trial Defendants" or "Defendants"). Specifically, the court made findings as to the burden of proof and set forth the standard for racketeering activities. The court also gave certain *inclinations* as to factual findings, in an effort to streamline proceedings and organize them for final sentencings. The court then gave a briefing schedule for the next stage of sentencings, which the court originally set as individual sentencings for each of the Trial Defendants.

Thereafter, the Trial Defendants contacted the court and requested a meeting, which occurred on February 23, 2018.  Counsel suggested, and the Government concurred, that before proceeding to individual sentencings, the court should first hold a

joint sentencing hearing on common objections as to overlapping, or closely related, issues of fact, as primarily identified by Defense counsel. To that end, counsel reviewed the Presentence Reports ("PSRs") and agreed upon joint "objections" and arguments advanced by some or all of the Trial Defendants.

On April 30, 2018, Defense counsel submitted a "Joint Memorandum Regarding Common Issues." In their joint memorandum they set forth the following common issues:

(1) To what extent is an individual defendant responsible for the distribution and/or manufacture of methamphetamine?

(2) Does membership in the DDMC and awareness of its bylaws make all conduct of other members foreseeable?

(3) Can an individual defendant be held responsible for the violent crimes of others based on the RICO conspiracy conviction?

Trial Defendants then identified various racketeering activities ("RA") which had been attributed to all or some of the Defendants, but which those Defendants did not believe should be attributed to them. Essentially, counsel applied their arguments with respect to the above three issues to maintain that various racketeering activities could not be attributable absent individual, direct involvement.

The following RAs were attributed in the PSRS to all or some of the Trial Defendants and were presented in the pre-hearing briefs:

| ACT | RACKETEERING ACTIVITY | DEFENDANTS |
|---|---|---|
| 1 | Methamphetamine Production & Distribution | All |
| 2 | Murder (of William Bausch) | MCKEOUN, SMITH, DARRAH, WITORT, RICH |
| 10-14 | Box Canyon Murders and Events | DEFENDANTS MCKEOUN, DARRAH, VANDIVER, RICH (jointly undertaken criminal activity) <br>------------------------------<br> DEFENDANTS SMITH AND WITORT (aiding and abetting) |
| 21 | NYNY Bar Assault | All |
| 30 | Conspiracy to Commit Witness Tampering (Roxanne Carolei) | All |
| 31 | Witness Retaliation (Anthony Clark) | All |
| 32 | Witness Retaliation (Darren Sloan) | All |

At the hearing, it was determined that RA 21 was best addressed at the individual sentencings, if necessary and if objections were raised as to its attribution. Also during the hearing, the Government stated that it would not be advocating to include RA 32 as an attributable act with respect to any defendant because of its apparent personal-relationship origin connected only to Victor Castano. The Government therefore did not intend to pursue this act as something undertaken in furtherance of the RICO conspiracy. The Government also stated that, with respect to RA 31, it would be advocating for its attribution only to those Defendants in Trial Group 2, because this incident of alleged intimidation occurred after Trial Group 1 Defendants had already been convicted. The Government specifically did not waive any position related to the date a Defendant had withdrawn, if at all, from the conspiracy, but stated that it would seek to hold accountable for RA 31 just those Defendants who had not yet been convicted.

3

The court heard argument (in varying degrees of depth) from counsel regarding their objections to the RAs 1, 2, 10-14, 30, 31, as attributed to their clients. All of the Trial Defendants waived their personal appearance at the hearing.  As the court explained at the hearing, the goal was to streamline proceedings by hearing argument from counsel that would be substantially—or even entirely—identical with respect to various racketeering acts and the various defendants.  The court hoped to resolve at least some of the global objections and then reserve opportunities for individual objections to individual presentence reports. The court's aim was, and is, to hear and consider the collective position on various arguments, but to make individualized findings based on those arguments.  That is, although Defendants may collectively present a joint position, and although the Government may generally respond to the Defendants as a group, the court's findings will be based on global legal conclusions and in some cases collective evidence of fact *as applied to individual Defendants*. All parties have agreed to this approach, and the court reserves for later hearing and consideration any individual issues which have not been fairly presented or resolved. Following issuance of this order, the court will set individual sentencings to hear any remaining objections which counsel believe they have not had an opportunity to present.

## I. STANDARD FOR RACKETEERING ACTIVITIES

> Racketeering activity constitutes "underlying racketeering activity" under U.S.S.G. § 2E1.1 for the purpose of calculating a defendant's base offense level for a RICO conviction if it constitutes relevant conduct as defined in U.S.S.G. § 1B1.3. *See Tocco*, 200 F.3d at 430 (holding that the relevant conduct rules apply to the determination of "underlying racketeering activity"). Relevant conduct includes, in pertinent part: (1) "all acts or omissions" that the defendant "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused"; and (2) "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity," that occurred during, in preparation for, or in

the course of attempting to avoid detection or responsibility for the RICO conspiracy. U.S.S.G. § 1B1.3(a)(1)(A) & (B). "The existence of relevant conduct is determined at sentencing by a preponderance of the evidence." *Corrado I, 227 F*.3d at 542.

*United States v. Tocco*, 306 F. 3d 279, 286 (6th Cir. 2002) ("*Tocco II*"). Thus, "in order to hold a defendant accountable for the acts of others [under U.S.S.G. §1B1.3(a)(1)(B) ], a district court must make two particularized findings: (1) that the acts were within the scope of the defendant's agreement; and (2) that they were foreseeable to the defendant." *United States v. Campbell*, 279 F.3d 392, 399-400 (6th Cir. 2002) (quoting *United States v. Studley*, 47 F.3d 569, 574 (2d Cir.1995)).

With respect to the first prong of the test, the Sixth Circuit has held that "[i]In order to determine the scope of the defendant's agreement, the district court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others. The fact that the defendant is aware of the scope of the overall operation is not enough to satisfy the first prong of the test and therefore, is not enough to hold him accountable for the activities of the whole operation." *Tocco*, 306 F.3d at 289.

## II. FINDINGS OF FACT

Having presided over two lengthy trials, considered the evidence presented in both trials, as applicable to each Defendant, reviewed the transcripts, and considered the argument of counsel, the court makes the following findings of fact.

### A. Questions Presented by Defendants

The court will first address the three questions presented by Defendants, which can be fairly characterized as "higher altitude" questions on how to approach the individual sentencings.

5

**1. To what extent is an individual defendant responsible for the distribution and/or manufacture of methamphetamine?**

Defendants challenge the propriety of attributing drug quantities from the entire conspiracy to individuals. Through counsel for Defendants Drozdowski and McKeoun, Defendants contend that there was insufficient evidence of an organized enterprise to manufacture and distribute, such that each Defendant could not have reasonably foreseen that a high quantity of methamphetamine was within the scope of the conspiracy. Defendants argue, essentially, that this was nothing more than a loosely-affiliated group of people who simply happened to be more or less simultaneously engaged in producing, using, and distributing extremely large quantities of methamphetamine.

Defendants' point appears to be that it was coincidental or accidental that they all were engaged in similar activity; from this they argue that that the activities of other members of the DDMC do not qualify conceptually as "jointly undertaken activity." Defendants and the DDMC are characterized as simply unruly motorcycle enthusiasts who really neither knew about nor could not predict the unruly behavior of the other members of the club. Defendants argue in short that they were too disorganized to be "organized."

The court disagrees and finds as follows:

1. There is abundant evidence that manufacturing and distributing methamphetamine was a primary and fundamental activity of the DDMC. Both trials featured credible and persuasive testimony about the ways in which large quantities of methamphetamine were either manufactured or otherwise acquired, and then transported to various DDMC chapters, delivered to its members, broken

down into smaller and smaller quantities, used by DDMC members, and distributed to other dealers and users in the community, both within and without the DDMC. Methamphetamine acquisition, use, and distribution was to the DDMC as water is to an aquarium; it was simply the environment in which DDMC existed. Accordingly, large-scale manufacture and distribution of methamphetamine was well within the scope of each of the Trial Defendant's agreement in joining the RICO conspiracy.

2. Indeed, the court finds abundant evidence that each Trial Defendant knew that the manufacture and distribution of methamphetamine was a primary and fundamental activity of the DDMC prior to entering the club. The court agrees with the Government that the DDMC RICO enterprise had the purpose of creating a demand for this very addictive drug, supplying that demand through manufacture or acquisition--or whatever other means may have been necessary.

3. The court heard evidence to support a finding that the DDMC was so well known as a distributor of methamphetamine that individuals, including "prospects" and other members-to-be would try to associate and hang around club members in order to find a way into the methamphetamine supply and distribution business.

4. The DDMC employed substantial initiation techniques which were designed and had the effect of indoctrinating the club members to the culture, rules, and goals of the DDMC. At the two trials, approximately two dozen former fully patched or prospective members of the DDMC testified at length regarding the selection of individuals for an invitation to become members of the DDMC, how they were trained and taught the bylaws and rules, the culture of strict confidentiality

essential to the continued operation of the DDMC, and the potentially dire consequences for failure to abide by the rules, as well as the methods DDMC used to achieve its goals. All of this testimony explained very well how members were expected to assimilate into the DDMC.

5. By the time that a prospect became a patched member of the DDMC, he would have known, without doubt, that one of the main activities of the DDMC was the manufacture and distribution of methamphetamine.

6. By the time that each of the individual Trial Defendants became a patched member of the DDMC, it was reasonably foreseeable to him that the manufacture and distribution of extremely large quantities of methamphetamine was within the scope of the conspiracy.

7. Defendants argue to the contrary, pointing to some testimony of drug distribution activities occurring in back rooms, behind closed doors, or otherwise hidden from the view of others. The court finds that such testimony is indicative only of a design by members to avoid detection by law enforcement. Rather than showing independent actions of discrete individuals, they show the joint actions of discreet co-conspirators.

8. To the extent that some activities were done secretly or surreptitiously, the court finds by a preponderance of the evidence that they were nonetheless reasonably foreseeable as being within the scope of the RICO enterprise. In fact, it was reasonably foreseeable that such actions would be undertaken, if possible, coyly and surreptitiously simply in an effort to avoid being blatantly obvious within view of non-member prospects, guests, and women.

**2. Does membership in the DDMC and awareness of its bylaws make all conduct of other members foreseeable?**

The short answer to this question is no. Membership in the DDMC and awareness of its bylaws does not, necessarily, make "all" the conduct of other members foreseeable. However, as the court found above:

1. The DDMC employed substantial initiation techniques which were designed and had the effect of indoctrinating the club members to the culture, rules, and goals of the DDMC. At the two trials, approximately two dozen former fully patched or prospective members of the DDMC testified in great detail regarding how individuals were selected and invited to become members of the DDMC, how they were trained and taught the bylaws, rules, and culture of the DDMC, the consequences for failure to abide by the rules, the methods the DDMC used to achieve its goals, and how members were expected to assimilate into the DDMC.

2. The court heard persuasive testimony to support a finding that, upon becoming a patched member of the DDMC, a Defendant would have agreed to abide by the national bylaws, to follow orders from local and national leaders, to support the goals and enterprise of the DDMC, and to be subject to violent punishment in the event that he were found in violation of a bylaw, rule, or DDMC custom. Defendants knew and agreed to enforce these bylaws through threats, intimidation, and violence. Defendants knew and agreed to support the DDMC with their time and money, that loyalty was of crucial importance, and that they would be subject, as noted above, to both corporal retaliation and social consequences if they did not follow the bylaws and rules of the DDMC.

3. With respect to the national leaders of the DDMC and the enforcers of its rules and

bylaws, specifically, McKeoun, Smith, Darrah, Witort, and Rich, the court provisionally finds that there was virtually no criminal activity that occurred in the club of which they were not aware, or did not sanction, encourage, expect, reward … and therefore reasonably foresee. The court will not finalize this finding, however, until an individual sentencing.

### 3. Can an individual defendant be held responsible for the violent crimes of others based on the RICO conspiracy conviction?

Defendants argue that they should not be held responsible for violent crimes of others in which they did not directly participate. Defendants cite to two Second Circuit cases to assert that individuals could not be held responsible for murders committed by others based on "mere knowledge of another participant's criminal acts" or because it is the "scope of the overall operation." See *United States v. Mulder*, 273 F.3d 91 (2nd Cir. 2001); *United States v. Johnson*, 378 F.3d 230 (2nd Cir. 2004). Setting aside that the cases cited by Defendants were not RICO conspiracy cases, the court has already provisionally found:

> *The court will not hold a Trial Defendant accountable only for the racketeering activities in which he directly participated, but all those activities which were within the scope and in furtherance of the conspiracy.* In so determining, the court will consider the abundant testimony concerning the culture of the DDMC, the rules by which members were expected to behave, the ways the rules were enforced, the consequences of leaving the club, and the means and methods that the clubs goals were effectuated. Finally, this evidence will also be considered when determining foreseeability.

(Dkt. # 2127, Pg. ID 30773 (emphasis added).) There is no reason to limit this holding to only nonviolent activities. So long as it is shown by a preponderance of the evidence that the activity was within the scope and furtherance of the conspiracy and that the activity was reasonably foreseeable, the court will hold the Defendant accountable for the

10

activity, whether or not it was a violent act, and whether or not he was a direct participant. Although the court will be cautious and withhold ruling on specific acts of violence until the individual sentencings, the court finds by a preponderance of the evidence as follows, attributable to all Trial Defendants:

1. Some degree of threatened and realized violence was integral to the conspiracy which each and every Trial Defendant joined when they became patched members of the DDMC.
2. The court heard substantial testimony regarding the violent nature of the DDMC, and how violence was used to further the RICO conspiracy. Violence was used, among other things, to subdue those members who were contemplating cooperating with law enforcement ("snitches get stitches"), violence was used to resolve disputes between members, to maintain discipline within the DDMC (such as the ritualized administration of "black eyes"), to discourage defection, to confiscate property (such as, most often, motorcycles), to promote the DDMC's self-advertised description as an "outlaw motorcycle club," and to further their industry of manufacturing and distributing methamphetamine.
3. The DDMC had a strong and rampant rule against "snitching," and it was well known that that violence and intimidation was used enforce this rule. The rule against snitching, and the violence to enforce it, was central to furthering the RICO conspiracy. It was necessary to protect the club: protect its members from prosecution, protect its methamphetamine enterprise, and protect its existence as a club against rival outlaw clubs.

4. That violence was unquestionably in the scope and furtherance of the RICO conspiracy was reasonably foreseeable to each of the Trial Defendants when they became patched members of the DDMC.

### B. Racketeering Acts

Having made factual findings resolving the joint objections, in the form of questions, posed to the court by the Trial Defendants, the court now turns to the RAs identified by Defendants as being implicated by those questions.

### 1. RA1: Methamphetamine Production & Distribution

Defendants queried at the hearing how the exact numbers were calculated to arrive at an amount of attributable methamphetamine and, relatedly, how to determine whether the methamphetamine was "pure," or "actual." The court heard, briefly, through counsel for the Government how, at the individual sentencings, the Government intended to show how it arrived at its calculations for amount of methamphetamine, and how whether using the calculation for 4.5 kilograms of actual methamphetamine or a 45 kilograms of a mixture, the end result for sentencing purposes would remain the same. The Government suggested that the evidence was such that there were likely two or even three pathways to arrive at a similar calculation. The court expresses no view on the amount calculation, at this point, and will await further presentation on the issue at the individual sentencings, depending on who objects and what the substance of the objection may be.

The court notes that the Government's position is that Defendants Castano and Drozdowski are responsible for at least 500 grams but less than 1.5 kilograms of actual methamphetamine, and the remaining Trial Defendants are responsible for at least 4.5

kilograms of actual methamphetamine or a 45 kilograms of a mixture.  The differentiation, the court presumes, has to do with the dates on which the Defendants entered into the conspiracy.

As the court noted in its October 16, 2017 Order, "although the court will make findings as to each Defendant after reviewing the relevant PSIRs, a logical and factually sensible starting point for determining the point at which a Defendant *could* be held accountable for racketeering activities will be the date of entry into the DDMC."  (Dkt. # 2127, Pg. ID 30772.)  After reviewing the relevant PSRs, and speaking with the probation department the court is inclined to find the following dates as applicable to the Trial Defendants and their date of entry into the conspiracy:

| Defendant | Date of Prospect | Date of Patch |
| --- | --- | --- |
| Jeff Garvin Smith | 1976-1977 | 1978 |
| Paul Anthony Darrah | Unknown | Approximately 1994 |
| Michael Kenneth Rich | Unknown | Approximately 1988 |
| David Drozdowski | Fall 2009 | Steak Fry, 2010 |
| Patrick McKeoun | Unknown | Approximately 1983 |
| Vincent Witort | Unknown | Mid-1980s |
| Victor Castano | July 2003 | August 2003 |
| Cary Vandiver | Unknown | Late 1990s |

The court had intended to confirm these dates with Defendants during the June hearing, but after attempting to do so, it became clear that Counsel were not prepared to confirm the dates without further consultation with their files.  The court provisionally

finds that the date a Defendant became a patched member of the DDMC will be the operative time for entering the conspiracy, however, the court will entertain objections if Counsel intends to argue, based on evidence, for a different date either earlier or later.

### 2. RA 30: Conspiracy to Commit Witness Tampering (Roxanne Carolei)

The PSRs propose that all Trial Defendants be held responsible for RA 30, which is the conspiracy to commit witness tampering related to the plot to murder Roxanne Carolei, the mother of David and Ronald Roberts (the "Roberts Brothers"). The Government argues that Drozdowski was directly involved in a thwarted murder-for-hire plot as retaliation for the Roberts' brothers' past cooperation with the Government and intimidation dissuading future cooperation and is responsible for this activity under U.S.S.G. § 1B1.3(a)(1)(A). The Government further contends that the remaining Trial Defendants are responsible for the activity under U.S.S.G. § 1B1.3(a)(1)(B), as it was reasonably foreseeable to all of them that a member of their RICO conspiracy would use intimidation to punish or prevent "snitches" from testifying against the DDMC. Defendants claim that there is insufficient evidence to find by a preponderance of the evidence that Drozdowski participated directly in this activity, or that it would be reasonably foreseeable that he would do so. There is no disagreement that Lori Maday contends that she was approached by Drozdowski to enlist the aid of "Chico" (John McClellan) to go to Roxanne Carolei and get her to stop her sons from talking. Drozdowski disputes that he approached Maday, and he disputes that, in any event, the implication from this does not support an attempt at murder-for-hire. The court disagrees, and has already ruled on this issue, on the record, at the June 2018 hearing. As stated then, and as further memorialized here:

1. The court credits Maday's version of this story and finds by a preponderance of the evidence that Drozdowski asked--or told--her to enlist the aid of Chico, to go to Roxanne, and to get the boys to stop talking.

2. This in itself is witness tampering making Drozdowski responsible for RA 30 under U.S.S.G. § 1B1.3(a)(1)(A).

3. While it remains open to *some* debate whether the mechanism to stop the Roberts from talking would be through verbal persuasion, physical intimidation, or even murder, the court finds that the natural implication, under the context with the involved participants, would be to use violence to do so.

4. The court also finds, by a preponderance of the evidence, that it was within the culture, goals, and the scope of the DDMC enterprise to use force, intimidation, cajoling, or any other means necessary to both retaliate against "snitches" and to keep them from testifying in the future.   It was reasonably foreseeable to all Trial Defendants when they joined the RICO enterprise that witness intimidation such as that used here would be part of the scope of the enterprise.

5. The court finds by a preponderance of the evidence, in this particular case, that word spread throughout the DDMC labeling the Roberts Brothers as "snitches" such that it was reasonably foreseeable that someone, and Drozdowski in particular, would engage in an attempt to tamper with their testimony, whether through persuasion or physical intimidation.   Thus, the remaining Trial Defendants will be held accountable for RA 30 under U.S.S.G. § 1B1.3(a)(1)(B).

### 3. RAs 2, 10-14, 31 (Murder of William Bausch, Box Canyon Events, Witness Retaliation (Anthony Clark))

As to the remaining RAs that have not been addressed, the court finds those acts are best left for the individual sentencings. The PSRs recommend that RA 2, the murder of William "Wild Bill" Bausch, which occurred in 1995, be attributable to Defendants McKeoun, Smith, Darrah, Witort, and Rich. The Government contends that these Defendants are responsible for the murder of William Bausch and the associated murder of Thomas "Double T" Thacker because at the time of the murders they were fully patched members of the DDMC, and that when joining the DDMC it was reasonably foreseeable that acts such as this murder were within the scope and furtherance of the conspiracy. The Government does not seek to hold Vandiver, Castano or Drozdowski accountable because they were not yet members of the conspiracy. The PSRs also recommend attributing the Box Canyon Events to Defendants McKeoun, Darrah, Vandiver, Rich as jointly undertaken criminal activity, and to Defendants Smith and Witort under an aiding and abetting theory. Finally, the Government stated during the June Hearing that it would advocate for the attribution of RA 31 (Witness Retaliation of Anthony Clark) to those Defendants in Trial Group 2, because this incident of alleged intimidation occurred after Trial Group 1 Defendants had already been convicted. Thus, this RA may be attributable, if at all, to Castano, Drozdowski, and Rich.

Although the court finds, generally, that acts of violence were reasonably foreseeable and within the scope and furtherance of the conspiracy, the court deems it prudent to make final rulings at the individual sentencings on the Box Canyon Events, the Murder of William Bausch, and the Witness Retaliation related to Anthony Clark.

## III. CONCLUSION

For the reasons stated above, the joint objections are hereby RESOLVED.

The court has attempted to determine as many of the joint issues as possible prior to the individual sentencings in an effort to streamline proceedings, flush out common issues, and best inform the parties as to the court's intended views. The court summarizes those findings above, as follows:

| ACT | RACKETEERING ACTIVITY | COURT'S FINDING |
|---|---|---|
| 1 | Methamphetamine Production & Distribution | Attributable to all Defendants. Amounts to be calculated at individual sentencings. |
| 2 | Murder (of William Bausch) | Reserved for the individual sentencings of Defendants McKeoun, Smith, Darrah, Witort, Rich |
| 10-14 | Box Canyon Murders and Events | Reserved for the individual sentencings |
| 21 | NYNY Bar Assault | Reserved for the individual sentencings |
| 30 | Conspiracy to Commit Witness Tampering (Roxanne Carolei) | Attributable to all Defendants |
| 31 | Witness Retaliation (Anthony Clark) | Government will advocate only for Trial Group 2 Defendants (Drozdowski, Castano, Rich) |
| 32 | Witness Retaliation (Darren Sloan) | Government does not intend to pursue, with the possible exception of Defendant Castano |

The court will now turn to the individual sentencings. The court will give the parties an abbreviated time period to file additional, individual objections, and then proceed to final sentencings. Separate orders will issue setting the deadlines.

IT IS SO ORDERED.

                                          s/Robert H. Cleland
                                          ROBERT H. CLELAND
                                          UNITED STATES DISTRICT JUDGE

Dated: August 17, 2018

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, August 17, 2018, by electronic and/or ordinary mail.

                                                           s/Lisa Wagner
                                              Case Manager and Deputy Clerk
                                              (810)292-6522

S:\CLELAND\CLELAND\JUDGE'S DESK\C3 ORDERS\11-20129.MCKEOUN.SENTENCINGISSUESTRIALDEFENDANTS.POSTHEARINGFINDINGS.RHC.DOCX