**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                                                    Case No. 11-20129

D-4 PATRICK MICHAEL MCKEOUN
D-5 JEFF GARVIN SMITH
D-6 PAUL ANTHONY DARRAH
D-7 CARY DALE VANDIVER
D-8 VINCENT JOHN WITORT
D-17 DAVID RANDY DROZDOWSKI,

      Defendants.

_____

**OPINION AND ORDER DENYING TRIAL GROUP ONE'S MOTIONS FOR
JUDGMENT OF ACQUITTAL**

Before the court are several Motions for Judgment of Acquittal filed on behalf of

Trial Group 1 Defendants Patrick Michael Mckeoun, Jeff Garvin Smith, Paul Anthony

Darrah, Vincent John Witort, and David Randy Drozdowski. (Dkt. # 1160, 1165, 1182,

1188, 1204, 1288, 1289, 1296.) Cary Dale Vandiver joins these motions. (Dkt. # 1213–

1217, 1293, 1294, 1302.) Because of the similarity of the issues and significant overlap

of the responses, the court will consolidate the motions and rule on them jointly. The

court finds that the issues have been adequately briefed and that an oral argument is

not necessary. E.D. Mich. 7.1(f)(2). For the reasons set forth below, the court will deny

Defendants' motions.

**I. BACKGROUND**

An overarching indictment charged 41 total defendants, either members or

persons related to the Devils Diciples Motorcycle Club ("DDMC"), with numerous

offenses involving firearms, false statements, witness tampering, perjury, gambling, violent crimes in aid of racketeering, various drug offenses, and violating the Racketeer Influenced and Corrupt Organizations Act (RICO).[1] The first group of Defendants began trial in September 2014. Following the conclusion of the Government's case in chief, several defendants filed motions for judgment of acquittal,[2] which the court deferred ruling on until the conclusion of trial. (Dkt. # 1208.)

On February 23, 2015, the jury delivered its verdict. The jury found Defendant Drozdowski guilty on Counts 36 and 37, but could not come to an agreement on Counts 1 and 3, which ultimately resulted in a mistrial as to those counts. (Dkt. # 1255, 1261.) The jury found Defendant Smith guilty on Counts 1, 2, 3, 26, 29 and 30, of Part I of the indictment, guilty of Count 1 of Part II of the indictment, but not guilty on Counts 2 and 3. (Dkt. # 1256.) The jury found Defendant Vandiver guilty on Counts 1, 3, 4, 26, 27, 28, and 30, but not guilty on Count 2 of Part I of the indictment; the jury also found Defendant Vandiver guilty on Counts 1, 2, and 3 of Part II of the Indictment. (Dkt. # 1257.) Defendant Darrah was found guilty on Counts 1, 2, 3, 5, 26 and 30 of Part I of the Indictment, guilty of Count 1 of Part II of the Indictment, but not guilty on Counts 2

---

[1] Defendants were charged under a wide range of criminal statutes including 18 U.S.C §§ 2, 371, 922, 924(c), 1001, 1512, 1623, 1952, 1955, 1959, 1962(d), and 21 U.S.C. § 841.

[2] Defendant Mckeoun filed a motion on January 6, 2015 (Dkt. # 1160), Drozdowski filed a motion on January 8, 2015 (Dkt. 1165), Smith filed a motion on January 12, 2015 (Dkt. # 1182), Darrah filed a motion on January 15, 2015 (Dkt. 1188), and Witort filed a motion on January 16, 2015 and joined in the arguments of all co-defendants (Dkt. # 1204). On January 16, 2015, Smith filed another motion joining in the arguments of Defendants Darrah and Witort.

and 3. (Dkt. # 1258.) Defendants Mckeoun and Witort were found guilty on Counts 1 and 3 of Part I of the Indictment. (Dkt. ## 1259 & 1260.)

On March 11, 2015, Defendant Drozdowski renewed his motion for judgment of acquittal and filed a Rule 33 motion for a new trial, which was joined by Defendants Mckeon, Smith, Darrah, Vandiver, and Witort. (Dkt. # 1287-1288.) Defendant Darrah also filed a renewed motion for judgment of acquittal on March 11, 2015. (Dkt. # 1289.) The Government consolidated these motions and filed a single response addressing all of the Defendants' various motions for judgment of acquittal on May 6, 2015. (Dkt. # 1338).

## II. STANDARD

"A Rule 29 motion is a challenge to the sufficiency of the evidence." *United States v. Kuehne*, 547 F. 3d 667, 696 (6th Cir. 2008). When considering a motion for judgment of acquittal, the court considers whether, after taking the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The court "may rely upon circumstantial evidence alone to support the jury verdict," *Rogers*, 769 F. 3d at 377, but the court cannot substitute its judgment for that of the jury by reweighing evidence or assessing the credibility of witnesses. *See United States v. Fisher*, 648 F. 3d 442, 450 (6th Cir. 2011). The court places a heavy burden on the defendant to show the insufficiency of the evidence. *United States v. LaPointe*, 690 F. 3d 434, 443 (6th Cir. 2012).

# III. DISCUSSION

Defendants argue that the Government failed to provide sufficient evidence from which a rational trier of fact could convict Defendants as to Counts 1, 2, 3, 5, 26, 29, 30, 36, and 37 of the Third Superseding Indictment. [3] (Dkt. # 1165, 1182, 1188.) Defendants also challenge the sufficiency of the evidence for Counts 1, 2, and 3 of Part II of the Indictment. (*Id.*) The Government argues that the evidence was sufficient for conviction. (Dkt. #1188.) The court will address the contested counts in turn below.

## A.    Count 1

Count 1 of the Third Superseding Indictment charged Defendants with conspiracy to commit RICO in violation of 18 U.S.C. § 1962(d). (Dkt. # 72, PageID 592–639.) The substantive RICO statute provides, "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Section 1962(d) makes it unlawful to conspire to violate § 1962(c). Defendant Drozdowski concedes the existence of an enterprise for purposes of his Rule 29 motion, but argues that the Government did not provide sufficient evidence to prove the remaining elements. (Dkt. # 1165, PageID13302.) Defendants Smith, Darrah, Vandiver, and Witort challenge the

---

[3] The jury could not reach a conclusion with respect to Defendant Drozdowski under Count 1 or 3, and the court declared a mistrial. Defendant Drozdowski was retried and found guilty on both counts. The court has already ruled on his motion attacking the sufficiency of the evidence on the subsequent trial, and will confine its findings here to the first trial.

sufficiency of the evidence for all elements of Count 1. Defendant Mckeoun challenges Count 1 in a more general sense.[4]

### 1. Existence of an Enterprise

Defendants Smith, Darrah, Vandiver, and Witort argue that there was no evidence at trial establishing the existence of a RICO enterprise because DDMC members that engaged in drug trafficking and other illegal activities acted independently and not as a continuing unit. (Dkt. # 1182, PageID 13786–87, Dkt. # 1188, PageID 13831–34, Dkt. # 1204, PageID 14196–97, Dkt. # 1215.) The RICO statute defines an enterprise as any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C. § 1961(4). In *United States v. Turkette*, the Supreme Court held that an enterprise includes "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). The Court later clarified the definition of this sort of association-in-fact enterprise and outlined three structural features of an association-in-fact: (1) a purpose, (2) relationships among those associated with the enterprise, (3) and longevity sufficient for the associates to pursue the enterprise's purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009). An association-in-fact enterprise "is simply a continuing unit that functions with a common purpose" for a period long enough to pursue a course of conduct. *Id.* at 948.

---

[4] Because Defendant Mckeoun did not file a renewed Rule 29 motion after the jury verdict, it appears that any Rule 29 argument has been waived. Nonetheless, the court will address the merits of the Rule 29 motion which he brought before the jury verdict.

The Government provided ample evidence for a rational jury to find the existence of a RICO enterprise. The jury heard testimony from 60 witnesses who described the DDMC's history, structure, and activities. (Dkt. # 1338, PageID 15975.) The Government also provided testimonial and documentary evidence regarding how DDMC regulated itself and interacted with other outlaw motorcycle clubs. (Dkt. # 1097, PageID 8739–44; Dkt. # 1112, PageID 9607–16, 9691–9696.) Additionally, the Government provided evidence regarding the common purpose of DDMC, including the manufacturing, distribution, and use of illegal drugs, specifically methamphetamine, and evidence explaining how the DDMC profited from the sale of illegal drugs. (Dkt. # 1112, PageID 9702–13; Dkt. # 1150, PageID 12092–98; Dkt. # 1151, PageID 12355–57; Dkt. # 1115, PageID 9728–29.) The DDMC's use and distribution of methamphetamine ensured the recruitment and retention of new members, and provided those members and the club a form of income; such activities also contributed to the image of the club as self-proclaimed outlaws. Additionally, evidence at trial proved the frequency of gambling activities, theft, and violence, all designed to achieve the common purpose of effectuating the image, existence, and continuation of the DDMC.

While Defendants attempt to cast the DDMC as a group of individual drug users who did not form an enterprise, the court rejects that characterization. "Continuity of structure exists where there is an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than ad hoc, basis." *United States v. Tocco*, 200 F.3d 401, 425 (6th Cir. 2000) (quoting *United States v. Kragness*, 830 F.2d 842, 856 (8th Cir.1987)). There was more than sufficient evidence produced at trial for a rational jury to find beyond a reasonable doubt the

existence of such a structure, through the testimony regarding the hierarchy within the club, the bylaws outlining the rules, and the methods of enforcement—through a culture of violence and submission. A rational jury could find the existence of an enterprise, or a "group of individuals associated in fact" who were "associated together for a common purpose of engaging in a course of conduct." *Turkette*, 452 U.S. at 583.

### 2. Engaged In or Affecting Interstate Commerce

Defendant Drozdowski, joined by Defendants Vandiver and Witort,[5] argues that the Government did not provide sufficient evidence to prove that the enterprise engaged in interstate commerce or that the enterprise's activities affected interstate commerce. (Dkt. #1165, PageID 13302.) Additionally, Drozdowski argues that his conduct was entirely intrastate. (*Id.* at 13303.) Drozdowski relies on *Waucaush v. United States* for the principle that no reasonable jury could find that an enterprise substantially affected interstate commerce based solely on evidence of violent crimes committed intrastate. *Waucaush v. United States*, 380 F. 3d 258 (6th Cir. 2004). Defendant's reliance on *Waucaush* is misplaced.

The *Waucaush* court held that the defendant did not violate RICO because the conduct of the *enterprise*, not the defendant, "was intrastate, noneconomic, and without substantial effects on interstate commerce." *Waucaush*, 380 F. 3d at 258. Interstate commerce includes trade, business, or travel between states and includes illegal economic activities such as drug trafficking, extortion, or operating an illegal gambling

---

[5] Defendant Vandiver filed separate notices of joinder as to every Rule 29 motion filed. Defendant Witort includes a conclusory statement at the end of his motion that he "hereby joins in, and incorporates by reference, arguments of his co-defendants in their Rule 29 Motions." (Dkt. # 1204, PageID 14201.)

business. *See United States v. Robertson*, 514 U.S. 669, 671 (1995); *Waucaush*, 380 F. 3d at 255. Here, the DDMC engaged in several interstate economic activities. When an enterprise itself engages in economic activity, the Government need only show a minimal effect on interstate commerce. *United States v. Riddle*, 249 F. 3d 529, 537 (6th Cir. 2001). Contrary to *Waucaush*, in this case there is ample evidence that the trafficking of drugs was an activity of the DDMC. And, where, as here, the enterprise engages in economic activity the Government need not prove a substantial effect on interstate commerce. Instead, "a de minimis connection suffices for a RICO enterprise that 'affects interstate commerce.'" *Waucaush*, 380 F.3d at 255 (quoting *United States v. Riddle,* 249 F.3d 529, 537 (6th Cir. 2001)). This is because "[a]s the Ninth Circuit put it, in upholding a RICO conviction predicated on only a de minimis effect on commerce, 'the heart of [the defendant's] crimes, drug trafficking and extortion, are quintessential illegal economic activities.'" *Id.* (quoting *United States v. Shryock,* 342 F.3d 948, 984 n. 6 (9th Cir. 2003)).

The Government offered evidence detailing the interstate economic activities of both DDMC and Drozdowski, specifically witness testimony that Drozdowski produced methamphetamine with other DDMC members. (Dkt. # 1148, PageID 11699, 11703, 11709.) The Government also provided evidence that Drozdowski used methamphetamine at a DDMC clubhouse in Alabama and transported methamphetamine to Michigan from a DDMC event in California. (Dkt. # 1148, PageID 11738–42.) Additionally, the Government provided witness testimony that DDMC members purchased bulk qualities of ephedrine from wholesalers in Ohio and then transported or mailed them to Defendant Witort in California. (Dkt. # 1070, PageID

5340-43.) Witort would then give the pills to a "Mr. Bill" who used them to manufacture methamphetamine. (*Id.* at 5344–45.) DDMC members Karen and Charles Casey then transported the methamphetamine to Ohio for sale. (*Id.* at 5347–48.) The proceeds from these sales were sent via Western Union to Smith in Michigan and Witort in California (*Id.* at 5362–69.) Based on this testimony, a rational trier of fact could find that the DDMC enterprise was engaged in interstate economic activity through illegal drug trafficking. Indeed, given the strength of the evidence, one wonders if any other conclusion could be reached rationally.

### 3.    Employed or Associated with the Enterprise

Defendants Smith, Darrah, Vandiver, and Witort argue that the Government failed to establish that they were associated with the DDMC in furtherance of illegal activities or that they were part of the overarching racketeering conspiracy. (Dkt. # 1188, PageID 13827–29; Dkt. # 1204, PageID 14195–97; Dkt. # 1204; Dkt. # 1216.)

"The concept of 'associat[ion]' requires both interpersonal relationships and a common interest." *Boyle v. United States*, 556 U.S. at 946. (quoting Webster's Third New International Dictionary 132 (1976) (defining "association" as "an organization of persons having a common interest"); Black's Law Dictionary 156 (rev. 4th ed.1968) (defining "association" as a "collection of persons who have joined together for a certain object")). "Moreover, each conspirator does not have to 'participate in every phase of the criminal venture, provided there is assent to contribute to a common enterprise.'" *United States v. Gardiner*, 463 F.3d 445, 457 (6th Cir. 2006) (quoting *United States v. Hughes,* 895 F.2d 1135, 1140 (6th Cir.1990)). "[A] defendant need not know about every member and component of the enterprise; he need only know 'the general nature

of the enterprise and that the enterprise extends beyond his role.'" *United States v. Tocco*, 200 F.3d 401, 425 (6th Cir. 2000) (quoting *United States v. Eufrasio*, 935 F.2d 553, 577 n. 29 (3d Cir. 1991)).

The Government provided extensive evidence at trial detailing Smith, Darrah, Vandiver, and Witort's various roles and actions within the DDMC. Defendant Smith was the National President of the DDMC during the 1980s and for a period of about 20 years. (Dkt. # 1072, PageID 5795; Dkt. # 1150, PageID 12048-50.) Defendant Darrah served as the National Vice President of the DDMC. (Dkt. # 1072, PageID 5795-97; Dkt. # 1077; PageID 7029.) Defendant Vandiver held the position of National Warlord within the DDMC. (Dkt. # 1077, PageID 7029.) Mckeoun was a patched member since at least the early 1990s, and served a chapter president of the Decatur Alabama Chapter in the late 1990s. Defendant Witort was a member of the DDMC for more than 30 years and was president of the California chapter. (Dkt. # 1112, PageID 9627-29; Dkt. # 1146, PageID 1102-04; Dkt. # 1150, PageID 12148-49.) Based this evidence, a rational jury could find that Defendants Smith, Darrah, Vandiver, Mckeoun, and Witort were associated with DDMC.

### 4.    Participation in the Enterprise's Affairs

Defendant Drozdowski argues that the Government failed to provide any evidence that he took part in the operation or management of the DDMC. (Dkt. # 1165, PageID 13304.) Drozdowski relies *on Reves v. Ernst & Young*, 507 U.S. 170, 183–85 (1993) for the principle that a person must participate in the operation or management of the enterprise itself for RICO liability to attach. (Dkt. # 1165, PageID 13304.) Although the *Reves* operation or management test limits the scope of criminal activity under

RICO, it does not require proof of a managerial role. *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008). *Reves* specifically states that liability under 18. U.S.C. § 1962(c) is not limited to upper-level managers of the criminal enterprise. *Id.* (citing *Reves*, 507 U.S. at 184.) Rather than requiring proof of a managerial role, *Reves* requires the Government to prove that the defendant had some part in directing the enterprises' affairs. *Fowler*, 535 F. 3d at 418. The *Reves* Court did not elaborate on what it means to direct the enterprise's affairs, but the Sixth Circuit has explained that direction "can be accomplished by either making decisions on behalf of the enterprise or *knowingly carrying them out.*" *Id.* (emphasis added). Individuals who are not members of upper management may nevertheless operate an enterprise if they are "under the direction of upper management" *Id.* (quoting *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994)).

Contrary to Drozdowski's argument, the Government provided evidence that he implemented and knowingly carried out the enterprise's decisions. Witness testimony was offered to show that Drozdowski was a member of the enterprise and maintained law enforcement manuals containing sentencing worksheets and other DDMC materials. (Dkt. # 1148, PageID 11795–11803.) The Government also provided witness testimony of Drozdowski's announced intention to rise in the ranks of the DDMC and of Drozdowski's actions to protect DDMC territory. (*Id.* at 11729-33.) Most memorably, Drozdowski and another DDMC member assaulted Robert Mclure, whom they mistakenly believed was a member of a rival gang. Additionally, testimony suggested that members of motorcycle clubs often acted in a hostile manner towards members of

rival clubs. (Dkt. # 1203, PageID 14114-16; Dkt. # 1093, PageID 7752–54, 7786; Dkt. # 1112, PageID 9595–97.)

The Government also provided evidence that Defendants Smith, Darrah, Vandiver, and Witort participated in the conduct of the enterprise. Defendant Smith and Darrah ordered DDMC members to assault other DDMC members for failing to disclose profits from drug trafficking activity and for other disciplinary purposes. (Dkt. # 1150, PageID12104-17.) Defendant Vandiver also ran drug trafficking operations for the DDMC. (*Id.* at 12089-97.)

Based on this evidence, a rational trier of fact could find that the Defendants either made or implemented the organizations' decisions.

### 5.      Agreement to Engage in a Pattern of Racketeering Activity

All of the Trial Group 1 Defendants, through their own briefs or by adopting the arguments of others, assert that the Government did not present evidence of an agreement for the Defendants to join in an enterprise with the intent to participate in a pattern of racketeering activity. (Dkt. # 1160, PageID 13230; Dkt. # 1204, PageID 14196; Dkt. # 1165, PageID 13306–09; Dkt. # 1206; Dkt. # 1217; Dkt. # 1214.) Defendants Smith, Darrah, Vandiver, and Witort also argue that the drug trafficking was carried out independently and not for the benefit of the DDMC. (Dkt. # 1188, PageID 12833–34; Dkt. # 1182, PageID 13786–87; Dkt. # 1204, PageID 14197–99; Dkt. # 1216; Dkt. # 1291.)

Under 18 U.S.C 1962(c), the Government must prove that a defendant was "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in

the conduct of such enterprise's affairs through a pattern of racketeering activity." A pattern of racketeering activity requires at least two acts of racketeering activity, the latter occurring within ten years of the former act. 18 U.S.C. § 1961(5). The Government must prove "that the predicate acts in connection with the conspiracy were related to the enterprise's illegal purpose and that the acts constitute a threat of ongoing criminal activity." *United States v. Corrado*, 227 F. 3d 543, 554 (6th Cir. 2000) (citing *H.J. Inc. v. Northwestern Bell Telephone. Co.*, 492 U.S. 229, 239 (1989)). The predicate acts must be connected to the affairs and operations of the enterprise, "but do not necessarily need to be directly interrelated." *Corrado*, 227 F. 3d at 554. "The relatedness requirement can be satisfied by proof that: (1) the defendant was enabled to commit the offense solely by virtue of his position in the enterprise; or (2) the offense was related to the activities of the enterprise". *Id.* (internal quotations omitted). "It is not determinative that the defendant committed the crime to further his own agenda, if indeed he was only able to commit the crime by virtue of his position within the enterprise." *Id.* (quoting *Salinas v. United States*, 522 U.S. 52, 63 (1997)). The Government can satisfy the continuity prong by presenting evidence that shows the predicate acts "were attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *Id.* (quoting *H.J., Inc.*, 492 U.S. at 242–43)).

There is no requirement of some overt act or specific act in the RICO conspiracy statute. *Corrado*, 227 F.3d at 553 (citing *Salinas*, 522 U.S. at 63). "A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense," and "a person may be liable for conspiracy even though he was incapable of committing the substantive offense." *Salinas*, 552 U.S. at 64. "The

supporters of a conspiracy are as guilty as the perpetrators . . . so long as they share a common purpose." *Corrado*, 227 F. 3d at 553 (citing *Salinas*, 552 U.S. at 64).

The Government offered extensive evidence at trial regarding a pattern of racketeering activity occurring over a period of decades and relating to the criminal purposes of the DDMC. The Government provided testimony that Witort agreed with other members of the DDMC to manufacture and distribute methamphetamine. (Dkt. # 1070, PageID 5339–41.) Witnesses for the Government also provided testimony that Witort agreed to supply DDMC members with large quantities of methamphetamine and other drugs over a period of decades. (Dkt. # 1150, PageID 12118, 12136-40.) Federal Agents and DDMC members testified that Defendant Mckeoun had ongoing agreements with DDMC member Charles Casey to manufacture methamphetamine on his property. (Dkt. # 1070, PageID 5370-73; Dkt. # 1074, PageID 6389–93.) Mckeoun also agreed to traffic methamphetamine with DDMC member Mastromatteo. (Dkt. # 1150, PageID 12100–02). Darrah sold methamphetamine and Vicodin to other DDMC members, ordered DDMC member Edward Taylor to assault Danny Burby, and gave Defendant Vandiver access to the DDMC Blue Water Chapter clubhouse so that Vandiver could use the building to manufacture methamphetamine. (Dkt. # 1072, PageID 5838–43; Dkt. # 1095, PageID 8306–08; Dkt. # 1093, PageID 7693–94; Dkt. # 1072, PageID 5826–35.) On multiple occasions, Smith provided Jeff Armstrong with large quantities of methamphetamine for him to distribute. (Dkt. # 1096, PageID 8497–99.) Drozdowski manufactured methamphetamine with DDMC member Smiley Villa, as well as DDMC member Chad Allard and April Sykes. (Dkt. # 1148, PageID 11700–20; Dkt. # 1111, PageID 9305–9313.) Drozdowski and Smiley Villa also assaulted Robert

Mclure because they believed he was wearing apparel related to a rival motorcycle club. (Dkt. # 1147, PageID 11592–98.) Indeed, these examples, while sufficient, merely scratch the surface of the evidence the Government provided regarding several different criminal acts related to the enterprise that occurred over a multitude of years.

### a. Defendant Witort's Participation in Box Canyon Incident

Defendant Witort, joined by Defendants Smith and Vandiver, argues that the Government did not present any evidence regarding an agreement to participate in the assault or kidnapping of DDMC members in Tucson Arizona. (Dkt. # 1204, PageID 14199–200.) Defendant Witort argues that the Government's evidence proved only that he was present for the beatings, not that he was involved in transporting the victims or taking their property. *Id.*

The Government presented evidence that several members of the DDMC's Tucson Chapter beat and tortured a woman affiliated with the Hells Angels Motorcycle Club ("HAMC"). (Dkt. # 1147, PageID 11436–42; Dkt. # 1113, PageID9 797–99.) To prevent problems with the HAMC, DDMC leadership decided to punish the members thought to be responsible for the incident. (Dkt. # 1147, PageID 11444–45; Dkt. # 1113, PageID 9800–02.) Before the Box Canyon incident, Witort and others met at DDMC member Cruz's house to discuss their plans. (Dkt. # 1147, PageID 11449–52.) The following day, approximately 15–20 DDMC members, including Witort, arrived at the Tucson Chapter clubhouse. (Dkt. # 1146, PageID 11169; Dkt. # 1147, PageID 11454–55.) The group, including Witort, proceeded to assault the five victims with their fists and baseball bats. (Dkt. # 1147, PageID 11455–58; Dkt. # 1146, PageID 11171.) The group

then loaded the victims onto a pick-up truck, drove them into the desert, and dumped them into a ravine. (Dkt. # 1147, PageID 11462–72; Dkt. # 1146, PageID 11176–89.)

The Government also introduced an email found at Smith's house addressed to several DDMC members, including Darrah, discussing and praising the assaults. (Dkt. # 1149, PageID 11957–62.) Shortly after the Box Canyon incident, Smith announced at a DDMC meeting that the five victims did something they should not have done and were dealt with. (Dkt. # 1113, PageID 9792–94.) Smith announced that the HAMC contacted him and praised the DDMC for how they handled the situation. (*Id.* at 9795.) Thus, contrary to Defendants' arguments, the Government presented sufficient evidence for a rational trier of fact to find that Defendants Smith, Vandiver, and Witort agreed to and participated in the Box Canyon incident and that the conduct was related to the DDMC enterprise.

### b.      Sufficient Proof of Homicides and Drug Trafficking as Evidence of Racketeering Activity

Defendant Mckeoun, joined by Defendants Vandiver and Witort, argues that the Government did not provide evidence regarding destruction of evidence, moving the body of Charles Isler, or of Mckeoun's involvement in a RICO conspiracy. (Dkt. # 1160, PageID 13224–30.) Mckeoun also argues that there is insufficient evidence of his involvement in the homicides of Thomas Thacker and William Bausch and for acts involving the manufacture and distribution of methamphetamine. (*Id.*)

To obtain a conviction for RICO conspiracy, "the government does not need to prove that the defendant committed or agreed to commit two predicate acts himself, or even that any overt acts have been committed." *United States v. Saadey*, 393 F.3d 669, 676 (6th Cir. 2005). Instead, the Government must prove that the defendant intended

"to further 'an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense [and] it suffices that [the defendant] adopt the goal of furthering or facilitating the criminal endeavor.'" *Id.* (citing *Salinas*, 522 U.S. at 65). "A defendant's agreement to participate in the RICO conspiracy may be inferred from his acts," and a conspirator need not agree "to commit every crime within the scope of the conspiracy so long as it is reasonable to infer that each crime was intended to further the enterprises affairs." *United States v. Gardiner*, 463 F. 3d 445, 457 (6th Cir. 2006) (citing *United States. v. Hughes*, 895 F. 3d 1135, 1140-41 (6th Cir. 1990)). Additionally, each conspirator does not have to participate in every phase of the criminal enterprise, provided there is assent to contribute to a common enterprise. *Id.*

The Government presented evidence that DDMC member William Bartell shot and killed Charles Isler over a dispute regarding methamphetamine quality. (Dkt. # 1150, PageID 12168–69.) The Government also offered evidence that DDMC members moved Isler's body before their arrest. (*Id.* at 12169–70.) The Government introduced certified conviction documents for William Bartell, Richard Koestra, Steven Jarvis, and Scott Jones for obstruction of justice and related to the homicide committed by William Bartell. (Dkt. # 1212, PageID 14289–91.)

The Government also presented evidence that DDMC members who left the organization in bad standing were often required to surrender their motorcycles to the club or have their property taken by force. When member Jeff Arnold left the group, Mckeoun, Vandiver, and other DDMC members took Arnold's motorcycle. (Dkt. # 1075, PageID 6527, 6554.) The Government offered evidence that, after leaving the club, Thomas Thacker was murdered by fellow DDMC members, and thereafter one of those

murderers, William Bausch, was himself killed. (Dkt. # 1096, PageID 8533–43.) The Government provided evidence showing that Mckeoun, as well as other patched members of the DDMC, knew that the enterprise robbed and murdered members who refused to surrender their property after leaving the organization. (Dkt. # 1096, PageID 8449–50.)

Further, the Government presented extensive evidence regarding methamphetamine trafficking and connections between Mckeoun, Smith, Darrah, Vandiver, and Witort's drug trafficking activities and the DDMC. The Government provided witness testimony showing that methamphetamine use was central to DDMC membership. (Dkt. # 1112, PageID 9643.) The Government also provided evidence that DDMC members could easily purchase methamphetamine from other DDMC members and that the DDMC was known for using and selling methamphetamine throughout the motorcycle club community. (Dkt. # 1071, PageID 5569–70; Dkt. # 1073, PageID 6045–54, 6061–68.) Mckeoun was known within the DDMC for manufacturing methamphetamine and agreed to traffic methamphetamine with DDMC member Mastromatteo. (Dkt. # 1150, PageID 12096–12100.) DDMC members Karen and Charles Casey distributed methamphetamine received from Witort, and Defendants Smith and Witort received the proceeds from the Caseys' methamphetamine distribution. (Dkt. # 1070, PageID 5359–60, 5383–84.) The Caseys also had an agreement with Mckeoun to acquire precursors and to produce methamphetamine. (*Id.* at 5373.) Vandiver agreed to transport 100 pounds of marijuana from DDMC member Victor Castano's property in Texas to Michigan and manufactured methamphetamine

with DDMC member Vernon Rich. (Dkt. # 1092, PageID 7377–78, 7468-70; Dkt. # 1093, PageID 7667–70.)

The evidence described above is sufficient for a rational jury to find that Mckeoun, Smith, Darrah, Vandiver, and Witort participated in a pattern of racketeering activity and agreed to participate in a RICO conspiracy. The Government provided evidence of Defendants and multiple DDMC members engaging in a pattern of racketeering activity over a period of years.  Additionally, it is reasonable for a jury to infer that the criminal activity was intended to further the enterprise and that the enterprise operated as a long-term association for criminal purposes.

## B.    Count 2

Defendants Smith and Vandiver argue that the Government provided insufficient evidence of gambling activity[6] to sustain a conviction on Count 2 because the Government failed to present evidence that five or more individuals either conducted, financed, managed, supervised, directed, or owned all of part of the gambling business. (Dkt. # 1182, PageID 13787; Dkt. # 1188, PageID 13834–35.) An illegal gambling business is a business which:

> is a violation of the law of a State or political subdivision in which it is conducted, involves five or more persons who conduct, finance, manage, direct, or own all or part of such business; and has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

---

[6] Defendant Witort also argues that there was insufficient proof that he was at all connected to any gambling activity, as a racketeering act. He argues that there was nothing tying him specifically to the activity.  Yet, as has been explained to Defendants multiple times, Defendant need not himself personally engage in the racketeering act. Instead, he need only agree that a conspirator, which could be himself or another member of the conspiracy, would engage in the pattern of racketeering activity.

18. U.S.C. § 1955(b)(1).

Defendants do not dispute the existence of a gambling business in violation of State law nor do they dispute that the business was in substantially continuous operation in excess of 30 days. The Government argues that the evidence it presented at trial established that five or more persons knowingly conducted, financed, managed, supervised, directed, or owned an illegal gambling business.

The Sixth Circuit has defined conducting a gambling business as performing "any function or duty that is necessary or *helpful* in the operation of the business." *United States. v. Merrell*, 701 F. 2d 53, 55 (6th Cir. 1983) (emphasis in original). "Any degree of participation in an illegal gambling business, aside from being a bettor, constitutes a violation." *United States v. Frazier*, 595 F. 3d 304, 307 (6th Cir. 2010) (citing *Sanabria v. United States*, 437 U.S. 54, 70 n. 26 (1978)). The Government was required to offer evidence that five or more people participated in the gambling business during the period the business was in substantially continuous operation.

The Government offered evidence showing that various DDMC members maintained slot machines in DDMC clubhouses in Michigan and other states. (Dkt. # 1077, PageID 7016.) DDMC chapter president, Gary Nelson, and Timmy Downs maintained two or three gambling machines at the DDMC Blue Water Clubhouse. (*Id.* at 7008.)  Veron Rich had the keys to the slot machines maintained at the DDMC Port Huron Clubhouse. (Dkt. # 1092, PageID 7346-47.) DDMC member William T. Smith placed gambling machines in DDMC clubhouses, including Port Huron, Mount Clemens and the Westside Clubhouse, to generate income for himself and to support the DDMC. (Dkt. # 1113, PageID 9815–16; Dkt. # 1114, PageID 10098–10100.) DDMC member

Mastromateo maintained the gambling machines at the Port Huron, Marine City, and Mount Clemens Clubhouses. (Dkt. # 1093, PageID 7583–85.) Smith provided a gambling machine to Smith for him to install in an Alabama clubhouse. (Dkt. # 1113, PageID 9820.) Taking the evidence in the light most favorable to the Government, this evidence is sufficient for a rational jury to find that five or more people participated in the gambling business while it was in substantially continuous operation.

### C.     Count 3

Defendants argue that there was insufficient evidence of a conspiracy to manufacture and distribute illegal drugs, the Government failed to prove a single conspiracy to distribute methamphetamine, and that there was no evidence Defendants conspired to possess with the intent to sell 500 grams or more of methamphetamine. (Dkt. # 1160, PageID 13230–31; Dkt. # 1188, PageID 13835; Dkt. # 1182, PageID 13787–88; Dkt. # 1204, PageID14198–99; Dkt. # 1206; Dkt. # 1213; Dkt. # 1216; Dkt. # 1217.) "[T]o establish a drug conspiracy, the government must prove (1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy." *United States v. Colon*, 268 F.3d 367, 375 (6th Cir. 2001). "Once a conspiracy is proven beyond a reasonable doubt, however, a defendant's connection to the conspiracy 'need only be slight,' and a defendant's knowledge of and participation in a conspiracy 'may be inferred from his conduct and established by circumstantial evidence.'" *United States v. Warman*, 578 F.3d 320, 332–33 (6th Cir. 2009) (quoting *United States v. Martinez*, 430 F.3d 317, 330–331 (6th Cir. 2005)).

The evidence supports the jury's verdict on this count. Exhaustive evidence was produced at trial showing the extent of the illegal drug activities of the DDMC, and the conspiracy to engage in those activities. Evidence showed that prospective members, including Defendants, knew of the illegal drug activities of the DDMC prior to becoming fully patched members, that Defendants knowingly agreed to join the drug conspiracy, and that they in turn participated in the activity themselves. While Defendants attempt to cast their involvement in the DDMC as something akin to a social club where its members happened to also occasionally use drugs, the court disagrees. A rational jury could find that members of the DDMC, including Defendants here, were knowing and voluntary conspirators involved in a large-scale drug conspiracy. As discussed in previous sections, and most specifically under Count 1, the analysis of "pattern of racketeering activity," the Government provided extensive evidence establishing the existence of a conspiracy to manufacture and distribute methamphetamine between Defendants and various other DDMC members.

Indeed, with the exception of Drozdowski,[7] the Defendants in Trial Group 1 were long-standing leaders of the DDMC, with significant involvement in management, control, and enforcement of the drug conspiracy. In light of the evidence of the drug operations of the DDMC, it defies reason to suggest that Smith, the National President; Darrah, the National Vice President; Vandiver, a National Warlord; and Mckeoun and

---

[7] With respect to Drozdowski, a rational jury could have found that he, too, was a member of the drug conspiracy. The Government showed that by the time Drozdowski became a fully patched member in 2010, he fully knew of and agreed to become a part of the drug conspiracy. Evidence was offered that he supplied methamphetamine to various individuals, including laying out lines at the DDMC Clubhouse in Mt. Clemens. Drozdowski also cooked methamphetamine with Chad Allard and April Sykes.

Witort, former chapter presidents and decades-long members, were not involved in the conspiracy. While it is true that mere membership in the DDMC does not prove membership of the drug conspiracy, the Government presented substantial evidence showing that the manufacture and distribution of drugs, particularly methamphetamine, was central to the economic vitality of the DDMC as well as the culture and social life of the DDMC. Defendants' roles, as long-standing leaders in the DDMC, at a minimum, constitutes circumstantial evidence tending to prove their involvement in the conspiracy. Beyond just their roles, as outlined above, the Government's proofs at trial was more than sufficient to show how each of these Defendants, knowingly agreed to join and then effectuate the conspiracy.

Based on this evidence, a reasonable jury could find that Defendants conspired to manufacture, distribute, or possess with the intent to manufacture or distribute 500 grams or more of a mixture containing a detectable amount of methamphetamine. This amount could be based on each Defendant's own conduct, or the conduct of other conspirators reasonably foreseeable to the Defendant. Evidence supports both concepts.

### D. Count 5

Defendants Darrah and Vandiver argue that Count 5 should be dismissed because the Government established Count 5 exclusively through the testimony of Mr. Pizzuti and because his testimony was not credible. (Dkt. # 188, PageID 1386; Dkt. # 1216.) Defendants' argument fails for multiple reasons. First, when deciding on a motion for judgment of acquittal, the court's responsibility is to determine the sufficiency of the evidence, "not reweigh the evidence, re-evaluate the credibility of witnesses, or

substitute our judgment for that of the jury." *United States v. Fisher*, 648 F. 3d 442, 450 (6th Cir. 2011) (quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)). Second, the Government relied on more than Mr. Pizzuti's testimony to establish Count 5. The Government also relied on testimony from Special Agent William Fleming and Special Agent David Opperman to establish the necessary elements for Count 5. (Dkt. # 1203, PageID 13933, 13996–97; Dkt. # 1072, PageID 5734–40.) The jury also heard various audio recordings of conversations between Pizzuti and Darrah. (Dkt. # 1072, PageID 5740, 5841–42.) Defendants do not make any arguments questioning the sufficiency of the Government's evidence apart from challenging the credibility of Mr. Pizzuti. Therefore, the court determines that the evidence was sufficient for a rational jury to find all the essential elements for distribution of methamphetamine.

### E.    Count 26

Defendants Smith, Darrah, and Vandiver argue that the court should dismiss Count 26 because the Government did not establish that Defendants assaulted Mr. Burby to dissuade him from testifying. (Dkt. # 1188, PageID 13837; Dkt. # 1215; Dkt. # 1216). To establish Count 26, the Government must have offered evidence to prove that one or more persons conspired to:

> [K]nowingly use intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to (1) influence, delay, or prevent the testimony of any person in an official proceeding; (2) cause or induce any person to withhold testimony, or withhold a record, document, or other object, from an official proceeding, alter destroy, mutilate, or conceal an object with intent to impair the objects integrity or availability for use in an official proceeding, evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object in an official proceeding or, be absent from an official proceeding to which

> such person has been summoned by legal process, or (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings.

18 U.S.C. §§ 1512(b), (k). The Government argues that it presented sufficient evidence for a jury could conclude that Defendants agreed to commit the crime of witness tampering and that they committed at least one overt act with the intent to hinder or delay Mr. Burby from communicating with federal law enforcement about the commission of possible federal offenses. (Dkt. # 1338, PageID 16021.)

The Government presented evidence of several telephone conversations between Smith, Darrah, and other DDMC members regarding their fears that Mr. Burby or Ms. Richards would speak with the police regarding an incident where Smith assaulted Ms. Richards. (Exhibit T-281, T-281A.) Defendants Smith and Darrah were aware that the FBI was investigating the DDMC because federal law enforcement searched several DDMC locations in 2007 and they discussed the FBI investigation. (Dkt. # 1077, PageID 7065–67.) Defendants Smith and Darrah attempted to determine if Ms. Smith or Mr. Burby had spoken with law enforcement. (Exhibit T-285, T-285A.) After Mr. Burby refused to attend club meetings or answer questions regarding his involvement with law enforcement, Smith kicked him out of the club. (Exhibit T-300, T-300A.) Darrah told DDMC member Nelson to contact Mr. Burby and threaten him to "keep his mouth shut." (Exhibit T-309, T-309A.) Darrah also ordered Nelson to go to Mr. Burby's house and collect DDMC property. (Exhibit T-312, T-312A.)

The Government also presented evidence that Mr. Burby was labeled a snitch by the DDMC. (Dkt. # 1093, PageID 7586, 7693–95.) Defendants Smith, Darrah, and Vandiver visited various bars and other motorcycle club hangouts to post threatening flyers labeling Mr. Burby as a snitch. (*Id.* at 7588–90.) Mr. Burby testified that he was concerned for his safety after learning about the threatening posters. (Dkt. # 1077, PageID 7073–75.) Special Agent Fleming contacted Mr. Burby and warned him that DDMC members were planning to assault him. (*Id.* at 7076.) Special Agent Fleming also met with Darrah and told him that the FBI received information that DDMC members were planning to assault Mr. Burby. (Dkt. # 1076, PageID 6884–85.) A short time later, DDMC members assaulted Mr. Burby at the Lighthouse Bar. (Dkt. # 1070, PageID 4274; Dkt. # 1077, PageID 7101–10.) Mr. Burby believed that the confrontation occurred because he left the DDMC and because the DDMC believed he was cooperating with law enforcement. (Dkt. # 1077, PageID 7080–81.)

Based on this evidence, a rational jury could find that Defendants conspired to assault Mr. Burby to prevent him from cooperating with the FBI.

### F.     Count 29

Defendants Smith and Vandiver argue that the Government did not provide sufficient evidence that the motive to assault Michelle Richards was related to the enterprise and that she suffered serious bodily injury. (Dkt. # 1182, PageID13789–92.) Pursuant to 18 U.S.C. § 1959(a)(6), the Government must prove that the Defendants attempted or conspired to commit assault resulting in serious bodily injury for the purpose of maintaining or increasing their position in an enterprise engaged in racketeering. The Government satisfies the purpose element if the jury could properly

infer that "the defendant committed the violent crime because he knew it was expected of him because of his membership in the enterprise or that he committed it in furtherance of such membership." *United States v. Heilman*, 377 F. App'x 157, 205 (3d Cir. 2010). In other words, the purpose element is met "if the jury could find that 'an animating purpose' of the defendant's action was to maintain or increase his position in the enterprise." *United States v. Hackett*, 762 F. 3d 493, 500 (6th Cir. 2014).

The Government provided evidence that Smith assaulted Michelle Richards at a DDMC party because Ms. Richards disrespected the DDMC by throwing Mr. Burby's DDMC patch on the ground. (Dkt. # 1075, PageID 6630–31.) After Ms. Richards threw the patch on the ground, Defendants Smith, Darrah, and Vandiver confronted her and instructed her to sit down by the campfire. (*Id.* at 6632.) Ms. Richards argued and said that she wanted to go home, at which point Smith slapped her in the face. (*Id.*) As mentioned above, Smith was the DDMC National President at the time. After exchanging heated words, Smith threw Ms. Richards to the ground, sat on top of her, and struck her repeatedly in her face and body until Mr. Burby managed to pull him off her. (*Id.* at 6633–34.) A rational jury could find that Defendant's position in the enterprise required him to punish Ms. Richards and that the animating purpose behind Smith's assault was to maintain his national reputation and position as president within the enterprise.

The Government also presented evidence that Smith violated Michigan Penal Code Section 750.84, assault with intent to do great bodily harm less than murder. The relevant elements for the offense are "(1) an attempt with force or violence to do bodily harm to another . . . and (2) an intent to great bodily harm less than murder." *People v.*

*Stevens*, 858 N.W. 2.d 98, 103 (Mich. 2014). Witnesses described Smith as a large man, while Ms. Richards was described as small—approximately 5'3'' and 118 pounds. (Dkt. # 1075, PageID 6615; Dkt. # 1077, PageID 7052.) Witness testimony also established that Smith repeatedly struck Ms. Richards and would have continued to strike her until Mr. Burby pulled him off her. (Dkt. # 1077, PageID7051-55.) After the incident Ms. Richards was bleeding from her nose, had a black eye, and other injuries to her face. (Dkt. # 1077, PageID 7058.) Taking the evidence in the light most favorable to the prosecution, a rational jury could find that Smith intended to do great bodily harm to Ms. Richards.

### G.    Count 30

Defendants Smith, Darrah and Vandiver argue that the Government failed to produce evidence that the assault of DDMC member Scott Perkins was related to the racketeering enterprise. Defendants characterize the assault as a favor between friends. (Dkt. # 1182, PageID 13792–93; Dkt. # 1188, PageID 13838–39.) The Government must prove that Defendants committed assault with a dangerous weapon or assault resulting in serious bodily injury for the purpose of maintaining or increasing their position in an enterprise engaged in racketeering. 18 U.S.C. § 1959(a)(3). Defendants do not challenge the existence of the RICO enterprise nor that an assault occurred but contest whether the purpose of the assault was to maintain or increase their positions in the enterprise.

The Government presented evidence that Defendants Smith, Darrah, and Vandiver threatened to assault Mr. Perkins with a metal club if he continued to allow Smiley Villa to live in Mr. Perkin's home. Mr. Villa was recently kicked out of the Next of

Kin riding club and was living with Mr. Perkins at the time. (Dkt. # 1094, Page ID 7856.) Mr. Perkins testified that he recognized the Defendants' actions as a threat, even though he may not have personally felt himself in *immediate* danger. (*Id.* at 7860.) Mr. Perkins also testified that Mr. Villa was acting disrespectful and belligerent while at the Green Street Tavern. (*Id.* at 7856-59.) Mr. Perkins testified that this kind of behavior embarrassed the DDMC. (*Id.* at 7877-79.) Based on this testimony, a rational jury could find that Defendants threatened Mr. Perkins as punishment for allowing Smiley Villa to live in his house and as punishment for Mr. Villa's embarrassing behavior. Much like the incident in Count 29, the jury could reasonably infer that Defendants' positions in the enterprise required them to punish Mr. Perkins and Mr. Villa.

### H.     Count 36

Drozdowski argues that the Government did not provide sufficient evidence to prove that he aided and abetted the racketeering conspiracy by assaulting Robert Mclure in the New York, New York bar. (Dkt. # 1165, PageID 13311.) Drozdowski also argues that the Government did not establish that Drozdowski assaulted Robert Mclure to maintain his position within the DDMC. (Dkt. # 1165, PageID 13313.) Similar to Counts 29 and 30 above, the Government must prove that Defendant committed assault resulting in serious bodily injury for the purpose of maintaining or increasing his position in an enterprise engaged in racketeering. 18 U.S.C. § 1959(a)(3). The Government must also prove that Drozdowski committed assault with intent to do great bodily harm in violation Michigan Penal Code §§ 750.84 and 767.39.[8]

---

[8] Michigan Penal Code § 767.39 states that every person concerned in the commission of an offense, whether directly commits the act constituting the offense or counsels, aids

The Government provided witness testimony describing the incident at the New York New, York bar. Brian Fields testified that while at the bar he saw a Hispanic male wearing DDMC colors with the name ESE or ESA (identified as Smiley Villa a/k/a "SA") shouting at Robert Mclure about the vest he was wearing. (Dkt. # 1147, PageID 11592–94.) As Fields described the situation, Villa "was in his face, basically nose-to-nose with him, screaming, like the top of his lungs, screaming at him to take it off." (*Id.* at 11592.) Mclure was "not a little guy," weighing about 240 pounds, but he had health issues, including liver problems and some form of disability requiring that he use a cane. (*Id.* at 11588-11596.) Mr. Fields observed Villa shouting at him about his vest and he came over to intervene and explain that the vest referred to a band, and to nonetheless instruct Mclure to take off the vest. According to Fields, Mclure was "absolutely not" an aggressive person and "he had no idea what was going on." (*Id.* at 11592, 11594.) Mclure started removing the vest, but slowly because "Bob moved really slowly." (*Id.* at 11594.) As he was removing the vest, however, he was unexpectedly "sucker-punched" by another DDMC member, later identified as Drozdowski. (*Id.* at 11595–96.) Fields testified that the blow from Drozdowski's force knocked him back several feet until he hit the wall and dropped to the floor unconscious, at which point the two men ripped the vest off of his body. (*Id.* at 11595–98.)

April Sykes testified that, while at a DDMC party, Smiley Villa received a call from Drozdowski requesting aid and he promptly left. (Dkt. # 1115, PageID 10541–42.) Ms. Sykes also testified that the New York, New York bar was a common hangout for

or abets in its commission may be prosecuted as if he had directly committed such offense. Mich. Comp. Laws. § 767.39.

DDMC members. (*Id.* at 10543–44.) She testified that later in the evening, Drozdowski and Mr. Villa returned with a patch and vest that resembled the patch of a rival motorcycle club. (*Id.* at 10546, 10550.) Ms. Sykes also noted that she saw flesh in one of Drozdowski's rings. (*Id.* at 10549.) Special Agent Fleming testified regarding a voluntary interview with Drozdowski after the assault. During that interview, Drozdowski told Special Agent Fleming that he and Mr. Villa were at the New York, New York bar and saw someone wearing a vest they thought belonged to a rival motorcycle club. (Dkt. # 1147, PageID 11639–41.)

The Government provided evidence regarding the interrelationships between rival motorcycle clubs to show that Drozdowski's purpose was to increase or maintain his position in the enterprise. If one club wanted to move into an area controlled by another, the new club required permission from the existing club or risked suffering violent retribution. (Dkt. # 1071, PageID 5560.) The Government provided testimony that the Outlaws Motorcycle Club was the DDMC's chief rival. The Government offered evidence of a specific instance where the Next of Kin (NOK) Riding Club asked the DDMC permission to convert to a motorcycle club, but DDMC refused because NOK members wore a pin that showed support to the Outlaws. (Dkt. # 1093, PageID 7749–54.) When Darrah learned about NOK's plans, he ordered DDMC member Scudder to threaten Lurch, the leader of NOK. (*Id.* at 7757–61.) The evidence presented at trial showed that Drozdowski and Mr. Villa attacked Mr. Mclure because they believed he was wearing clothing in support of a rival motorcycle club.

Taking the evidence in the light most favorable to the prosecution, a reasonable jury could conclude that Drozdowski assaulted Mr. Mclure to increase or maintain his position within DDMC.

## I.      Count 37

Drozdowski argues that the Government's evidence was insufficient to prove that he either actually or constructively possessed ammunition. Under 18 U.S.C. § 922(g)(1), the Government must prove that Drozdowski was convicted of a felony and possessed any firearm or ammunition, which has been shipped or transported in interstate commerce. Drozdowski does not dispute that he was a convicted felon or that the firearm or ammunition traveled in interstate commerce, but contends that the Government did not prove that he possessed the firearm or ammunition. (Dkt. # 1165, PageID 13314–15.)

The Government can prove actual and constructive possession through circumstantial evidence. *United States v. Bailey*, 553 F. 3d 940, 944 (6th Cir. 2009) (citing *United States v. Craven*, 478 F. 2d 1329, 1333 (6th Cir. 1973)). "A person who knowingly has direct physical control over a thing at a given time is then in actual possession of it." *Baily*, 553, F. 3d at 944 (quoting *United States v. Frederick*, 406 F. 3d 754, 765 (6th Cir. 2005)). "Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *Baily*, 553 F. 3d at 944 (quoting *Craven*, 478 F.3d at 1333)). Constructive possession requires specific intent. *Id.* at 945. The Government must "show some connection or nexus between the defendant and the firearm or ammunition, which can be established by

showing that the defendant had knowledge and access to the firearm or ammunition." *Id.*

The Government presented evidence of ammunition seized by law enforcement from two different locations in Drozdowski's home. (Dkt. # 1148, PageID 11784–85.) Lori Maday testified that when she and Drozdowski moved into a trailer together, she unloaded a moving box containing ammunition that the two of them brought with them from previous residences. While Maday testified that she thought the ammunition was "actually Lurch's," the jury could have reasonably found that Drozdowski was, at a minimum, in constructive possession of the ammunition. Additionally, The Government also introduced photographs showing Drozdowski holding firearms. (Dkt. # 1111, PageID 9316–19.) Ms. Maday took the pictures admitted as evidence and testified that the firearms were genuine and that she had previously seen Drozdowski carry firearms on his person. (Dkt. # 1148, PageID 11744–45.)  This evidence could be taken by a rational jury as an indication of Drozdowski's intent to possess firearms as well as ammunition.

Taking the evidence in the light most favorable to the prosecution, a rational jury could conclude that Drozdowski had dominion and control over the ammunition in his residence, and that Drozdowski intended to possess the ammunition.

### J.    Part II, Counts 1, 2, & 3

Defendants Smith, Darrah, and Vandiver argue that the testimony of two previous perjurers is insufficient to establish the requisite elements for Part II, Counts 1, 2, and 3. (Dkt. # 1182, PageID 13793–94; Dkt. # 1188, PageID 13840–41; Dkt. # 1215; Dkt. # 1216.) In making this argument, Defendants are asking the court to weigh the

credibility of the witnesses. The court is not permitted to "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury." *Fisher*, 648 F. 3d at 450 (quotations omitted).  Accordingly, the court rejects Defendants' challenges to Count 1, 2, and 3 in Part II of the indictment.

## IV. CONCLUSION

On Rule 29 motion, Defendants bear a very heavy burden. *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (citation omitted). Defendants here do not meet that burden, and have not not articulated any appropriate reason for the court to depart from the determinations of the jury. Simply put, the jury verdicts were well supported by the evidence...indeed, extremely well supported. Accordingly,

IT IS ORDERED that Defendants' Motions for Judgment of Acquittal (Dkt. # 1160, Dkt. ##1165, 1182, 1188, 1204, 1288, 1289, 1296) are DENIED.  This disposition also resolves the notices of joinder (Dkt. # 1213–1217, 1293, 1294, 1302), which are correspondingly DENIED.


  s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  October 30, 2018

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, October 30, 2018, by electronic and/or ordinary mail.

  s/Lisa Wagner
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\CHD\Criminal\DD\11-20129.TrialGroup1.Rule29.CHD.docx