**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

       Plaintiff,

v.                              Case No. 11-20129

D-4 PATRICK MICHAEL MCKEOUN
D-5 JEFF GARVIN SMITH
D-6 PAUL ANTHONY DARRAH
D-7 CARY DALE VANDIVER
D-8 VINCENT JOHN WITORT
D-17 DAVID RANDY DROZDOWSKI,

       Defendants.

_____/

**OPINION AND ORDER DENYING TRIAL GROUP ONE'S
MOTION FOR MISTRIAL AND MOTION FOR NEW TRIAL**

Before the court are two motions for mistrial and/or a new trial, filed by Defendant

Drozdowski on behalf of Trial Group 1 Defendants Patrick Michael Mckeoun, Jeff Garvin

Smith, Paul Anthony Darrah, Vincent John Witort, and David Randy Drozdowski. The

court finds that the issues have been adequately briefed and that an oral argument is

not necessary. E.D. Mich. 7.1(f)(2). For the reasons set forth below, the court will deny

Defendants' motions.

**I. BACKGROUND**

A massive, overarching indictment charged 41 total defendants, either members

of or persons related to the Devils Diciples [sic] Motorcycle Club ("DDMC"). Allegations

embraced numerous offenses involving firearms, false statements, witness tampering,

perjury, gambling, violent crimes in aid of racketeering, various drug offenses, and

violating the Racketeer Influenced and Corrupt Organizations Act (RICO).[1] The first group of Defendants began trial in September 2014. On February 23, 2015, the jury delivered its verdict. The jury found Defendant Drozdowski guilty on Counts 36 and 37, but could not come to an agreement on Counts 1 and 3, which ultimately resulted in a mistrial as to those counts. (Dkt. # 1255, 1261.) The jury found Defendant Smith guilty on Counts 1, 2, 3, 26, 29 and 30, of Part I of the indictment, guilty of Count 1 of Part II of the indictment, but not guilty on Counts 2 and 3. (Dkt. # 1256.)  The jury found Defendant Vandiver guilty on Counts 1, 3, 4, 26, 27, 28, and 30, but not guilty on Count 2 of Part I of the indictment; the jury also found Defendant Vandiver guilty on Counts 1, 2, and 3 of Part II of the Indictment. (Dkt. # 1257.)  Defendant Darrah was found guilty on Counts 1, 2, 3, 5, 26 and 30 of Part I of the Indictment, guilty of Count 1 of Part II of the Indictment, but not guilty on Counts 2 and 3. (Dkt. # 1258.) Defendants Mckeoun and Witort were found guilty on Counts 1 and 3 of Part I of the Indictment. (Dkt. ## 1259 & 1260.)

On February 9, 2015, Defendants filed a Joint Motion for Mistrial Based Upon Prosecutorial Misconduct During the Government's Closing Rebuttal Argument. (Dkt. # 1240.)[2] Defendants claim that the Government (1) engaged in a pattern of flagrant misconduct by denigrating defense counsel; (2) impermissibly commented on the Defendant's right not to testify; (3) impermissibly appealed to the jury's sense of

---

[1] Defendants were charged under a wide range of criminal statutes including 18 U.S.C §§ 2, 371, 922, 924(c), 1001, 1512, 1623, 1952, 1955, 1959, 1962(d), and 21 U.S.C. § 841.

[2] Although the motion was purportedly brought jointly on behalf of all Defendants, Defendant Smith filed a separate Notice of Joinder to the motion. (Dkt. # 1241.)

community; (4) implied that defense counsel believed defendants were guilty; and (5) urged the jury to convict based on Drozdowski's bad character.  Defendants further contend that the Government's bad behavior "goaded," or forced them into moving for mistrial and the Government should therefore be barred from retrying them based on double jeopardy grounds.

On March 11, 2015, Defendant Drozdowski filed a Joint Motion for New Trial Pursuant to Federal Rule of Criminal Procedure 33.[3]  (Dkt. # 1287.)  This motion contains no argument or analysis, but simply references 18 previously-filed motions or orders and all of their previously-made oral motions for mistrial, four of which are cited by transcript number.

## II. STANDARD

"[T]he adversary system permits the prosecutor to 'prosecute with earnestness and vigor and a prosecutor may strike hard blows as long as he does not strike foul ones." *United States v. Young*, 470 U.S. 1 (1985), at 7 (internal quotations omitted)(citing *Berger v. United States,* 295 U.S. 78 (1935)). "[A] criminal conviction  is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can [a court] determine[ ] whether the prosecutor's conduct affected the fairness of the trial." *Id*. at 11.  A motion for mistrial alleging prosecutorial misconduct is unavailing unless the conduct was "so pronounced and persistent that it permeates the entire

---

[3] Defendant Vandiver filed a separate Notice of Joinder to the Motion for New Trial.  (*See* Dkt. # 1292.)

atmosphere of the trial". *United States v. Krebs*, 788 F.2d 1166, 1177 (6th Cir. 1986) (internal citations and quotations omitted).

When evaluating a claim of prosecutorial misconduct, the court asks first if the conduct was improper at all and, if it was, whether it was "flagrant." *United States v. McAllister*, 693 F.3d 572, 585 (6th Cir. 2012). In that regard, the court asks "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *United States v. Hargrove*, 416 F.3d 486, 492 (6th Cir. 2005) (quoting *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994)).

### III. DISCUSSION

### A. Motion for New Trial

The court will first dispense with Defendants' Motion for New Trial. Defendants do no more than "incorporate by reference" a variety of objections, oral motions, and written motions which have already been considered and ruled upon, either implicitly or explicitly by this court. Defendants point to no specific allegation of error or articulate any form of reasoned analysis giving context to their motion. Rather than advancing a cohesive position or organized argument, Defendants appear to be attempting to restate, or perhaps preserve for appellate review, previous unpersuasive positions. The court is neither required nor inclined to ferret through all of the referenced documents to decipher what argument Defendants may be trying to advance at this late stage of the litigation. The court rejects as improper and groundless Defendants' motion. Incorporating arguments by reference and otherwise failing to provide any detail or

argument whatsoever is simply not a sustainable method of presenting a position to the court. *See, eg., Snyder v. United States*, 23 F. App'x 212, 213 (6th Cir. 2001).  Nor is the practice desirable. The result of encouraging such a practice would be every unsuccessful movant immediately filling a new, nearly identical motion claiming that the denial of the unsuccessful motion breached his right to a fair trial. The court sees one means to at least approximate the result apparently sought here: filing a proper, timely motion for reconsideration.

### B.  Motion for Mistrial

Defendants bring next a motion for mistrial, taking aim at various statements made during the Government's closing argument.  Closing argument began on January 20, 2015, with the Government's initial closing lasting approximately six hours. Defendants' closing argument lasted, collectively, around ten hours, and the Government's rebuttal was about three and a half hours long.  In considering this motion, the court has reviewed the transcript of the closing arguments and consulted its own recollection.

Defendants cast the Government's argument as inflammatory, improper, and objectionable.  As explained below, the court disagrees.

The Government's initial argument was focused, evidence-based, and altogether proper.  It was lengthy but only of necessity. In response, Defendants, individually and as a cooperating collective, presented a combined argument that was sometimes merely vigorous and at other times wildly vitriolic. Throughout, it was spotted with *ad hominem* accusations and evidence-free attestations.

The Government was thus placed in a difficult position in organizing rebuttal argument, which is properly focused fairly tightly upon answering the principal arguments of the defense. Much of Defendants' argument invited, indeed demanded a response. However, Government counsel, in the court's view, did not stray from the fundamental role as a responsible officer of the court. Government counsel presented a rebuttal that was, if anything, restrained given the comments of various defense counsel during their arguments.

The court finds nothing of merit in Defendants' motion, and further finds that the Government's response brief exhaustively and correctly responded to each of the allegations. The court will briefly address each of the presented issues.

### 1. Defendants' Closing Arguments Invited a Response

In order to evaluate, the court must understand the context of the Government's rebuttal. *United States v. Young*, 470 U.S. 1, 11 (1985) (the "statements or conduct must be viewed in context"). A brief description of the Defendants' closing arguments is needed.

Defendant Vandiver's attorney opened the defense arguments, asserting that when the Government provides defendants with plea bargains with cooperation agreements, it is the equivalent to "purchasing" their testimony with large sums of money. Counsel posed a hypothetical of "how much is any of our freedom worth?" (Dkt. # 1232, PageID 14775.) He continued by arguing that "the Government has bent over backwards, contorted and twisted this case,"(*id.*), and that it was based on "an investigation where the Government ignored what it wanted to and focused on the other," (*id* at 14786).

6

This theme produced repeated references to "purchased" or "bought testimony," stating that "if you buy the truth, it is not the truth." (*Id.* at 14773.)  As counsel amplified this theme he presented representations of the evidence that were misleading at best, specifically as to who did or did not say Vandiver was involved in methamphetamine sales.  Finally, as the Government points out, Vandiver's attorney referred to the Box Canyon beatings, and suggested that the victims got what they deserved after what they did to "that poor woman" who was "kidnapped and beaten and tortured and possibly raped."  (*Id.* at 14801.)  This type of argument featuring "what happened" to the "poor woman," was devoid of any basis in the admitted evidence since the otherwise hearsay statement of what was supposed to have "happened" to her was admitted for a strictly limited purpose, *i.e.,* the mere uttering of the statement. The Government suggests, and the court agrees, that this urges jury nullification of culpability over the Box Canyon events.

Defendant Scott Sutherland, the only defendant ultimately acquitted, argued next and also proceeded to misstate facts and improperly restate legal principles, adding to the likelihood of jury confusion; he also urged jury nullification.  Counsel's argument with respect to the statute of limitations and his intimation that this court had endorsed Sutherland's position prompted the court, *sua sponte*, to issue a curative instruction to the jury.  (*Id.* at 14827.) Counsel accused the Government of "fear mongering," and asked "is that what we've come to in this country? Is that what we're about?" (*Id.* at 14831.)  He asserted that "virtually every witness" called by the Government was facing a life sentence, a claim that was untrue in fact, and based on no evidence.  When counsel implied the Government had to prove *all* of the racketeering activities, the

Government objected and the court again had to give a curative instruction. (*Id.* at 14835.) The Government correctly points out various other objectionable portions of this closing but what the court most clearly recollects, and what cannot be discerned from the transcript, is the abrasively loud volume that this particular attorney used throughout his closing. He was virtually shouting his arguments at the jury, raising his voice to a near-scream as he repeated twice his client's vulgar reaction ("fuck you") in a letter claiming that people were lying about him. Counsel displayed what seemed to the court as unwarranted delight, as he turned toward the Government's table and let loose the expletive for a second time. Whether his body language was a show for the jury or merely incidental, the court does not know. The court is confident, however, that people far down the hallway could hear the shout. The court strongly considered interrupting the argument *sua sponte* at that point, but relented.

While there is nothing *inherently* improper about using such a voice toward the jury or quoting admitted exhibits and testimony, this behavior by Sutherland's counsel nonetheless established a tone of hard edged aggression that fell short of the expected level of in-court civility; this approach appeared to the court as having encouraged others to take up the cry, so to speak, in succeeding hours of presentation.

Defendant Smith's attorney, like Vandiver's, referred to the female victim, Heather Ford, whose mistreatment prompted the Box Canyon attacks:

> And you know, they really downplayed it. The Government really downplayed what happened to her. I mean, really downplayed. I mean, the testimony was that this girl, for whatever -- she owed a drug debt, for whatever reason, was taken into a room, which was the clubhouse, she had – they used tasers on her. Do you remember the tasers? I had them show on the board? They hooked her up, electrically. They, you know, sexually molested her. And they—

8

(*Id.* at 14905.)  The Government then objected because once again a defendant's attorney was relying on a statement which would be inadmissible hearsay and had been received only with strict limitations. All defense attorneys well knew the limitation, but nearly all roundly ignored it.

Smith's attorney also implied improper motives by the Government when he suggested that the Government wanted a conviction in order to be featured in "Government Weekly," (*Id.* at 14876), and pointedly suggested that government prosecutors request or reward perjury when they are brokering plea deals because defendants "have to give you information, information that you like." (*Id.* at 14883.) Indeed, in his description of the proffer- and plea-negotiation process, this attorney veered away from referring to actual witness testimony and began offering personal attorney-generated testimony.  This tactic caused the Government to once again object, and the court to redirect counsel.  With respect to the plea deal of Michael Mastromatteo in particular, counsel incorrectly stated that Mastromatteo was given a plea bargain of six years imprisonment and that, with time served, he was "walking free."  (*Id.* at 14880.)

Defendant Mckeoun's attorney, in turn, avoided implying improper motives on behalf of the Government, but did on multiple occasions offer personal opinions on the credibility of witnesses injecting commentary that was too close to testimonial.  Counsel, for example, told the jury, without referencing any witness testimony or other evidence, that his client was "opposed to Vicodin," and "he's opposed to other guys in the club using the Vicodin." (*Id.* at 14941.)

Defendant Drozdowski's attorney followed the theme, arguing that the

Government's repeated use of a photograph of Drozdowski holding firearms was a "trick." With respect to Sarah Sweet's testimony about acts in aid of the conspiracy, he argued that there was "[n]o testimony that Agent Fleming even tried to corroborate this. And why? I think at this point it's become pretty clear. It's because, no, she said what I wanted to hear. I don't need to corroborate it. Done. As long as you say what I want to hear, it's good enough for me." (Dkt. # 1233 at PageID14973.) In discussing "corrupted testimony," Counsel suggested that the Government told witnesses to say only what the Government wanted to hear, and used variations of the word "corrupt," indicating a barely-veiled *ad hominem* accusation of subornation of perjury:

> It is corrupted by influence. It is corrupted by the threat of 10 years to life. The Federal Government is going to charge you with a crime for which the penalty is 10 years to life. Tell us what we want to hear. Cooperate with us. Do nothing to diminish your effectiveness on our behalf. You can have a misdemeanor. You can have probation. Corrupted influence comes on that stand. Corrupted testimony comes through the Government's case.

(*Id.* at 14978.)

Likewise, counsel for Defendant Darrah also argued that the Government did not seek evidence which went against its theory of the case, contending:

> There's been a constant theme from yesterday, and I want to continue it on to today, with the Government's overreach in this case. The Government, the Government overreach[ed] in this case. And there's a couple of instances that this occurred through the course of the trial that I want to highlight, because I think it's important.
>
> When the Government decides that this is the crime that's going on, they put -- and you've heard it for the last four months, they put all of their time, effort, money behind proving the theory of what they think is going on.

(*Id.* at 15014-15015.) The Government objected multiple times during this closing, particularly with respect to counsel's demonstrative aids, an admittedly "incorrect" slide and a composite audio recording. The Government also rightly complained that counsel

was arguing facts that clearly were not in evidence. While the court did not make a specific finding on some of these objections, the court did need to caution counsel to please refer to admitted evidence, rather than talking about "facts" in general.

The most troublesome and unprofessional defense argument came last, from Defendant Witort's attorney. Not only did counsel continue with the theme that the Government was either suborning perjury or turning a blind eye by intentionally not verifying its witnesses' testimony, but counsel stressed, exhaustively, the lack of documentary support---implying nefarious motives for the lack of such support:

> Well, Ms. Casey said the Government seized her paperwork. So if the Government seized her paperwork, you can only draw one of three conclusions to the extent that no paperwork has been brought here to corroborate a woman with a background as a liar. One of three conclusions can be reached:
>
> Number one, she's perjuring herself. The Government, whether it be the State or Federal Government, never seized her paperwork or she's lying again. And I don't like to call people liars and I try not to do that, but when one does not tell the truth, the shoe has to fit. So either, one, she's perjuring herself.
>
> Number two, they did seize the paperwork and didn't bother to look at it.
>
> Or number three, they seized the paperwork, looked at it, it did not support the claims made by Ms. Casey, and decided to ignore it. Because it's not here. There's only one of three options with that kind of testimony.

(*Id.* at 15041.) Counsel therefore invited the jury to speculate in concluding that the Government knew a witness was perjuring herself and did not care, or even ignored exculpatory evidence thereby committing a gross ethical violation. Counsel queried to the jury: "Does the Government even believe its own witnesses . . ." (*Id.* at 15042.)

Similar to Vandiver and Smith's attorneys, Witort's attorney also attempted to argue about facts related to the Box Canyon events which were not in evidence, but

mention of which was provided only for a limited purpose. Specifically appealing to the

emotions of the jury, counsel attempted to discuss precisely what happened to Heather

Ford, despite repeated objections from the Government and instruction from the court to

cease the line of argument.  After hearing the objections and providing instructions to

move along, counsel repeatedly continued improper argument regarding the details of

the reported assault on Heather Ford.  The Government objected again:

> GOVERNMENT: Your Honor --
> THE COURT: That is -- no, that is --
> COUNSEL: You're right. You're right. I'll move on.
> THE COURT: That is exactly --
> COUNSEL: Strike that. We're going to move on.
> THE COURT: Mr. Pitts, stop. That is exactly contrary to my instruction to
> the jury.
> COUNSEL: You are right, Judge.
> THE COURT: There is no evidence --
> COUNSEL: Right.
> THE COURT: -- supporting that statement.
> COUNSEL: If I may, let me rephrase.
> THE COURT: You continue to interrupt me. Please don't.
> COUNSEL: I'm sorry.
> THE COURT: I want to emphasize to the jury that there
> is no evidence that any such things happened. Only that those
> words were uttered. That's the meaning of a limited purpose
> receipt of that kind of testimony from the detective. You move
> to your next point now.

(*Id.* at 15076-15077.)  Counsel then immediately began the same line of argument,

which required yet another direction from the court:

> THE COURT: I'm going to direct you to move to your next point.
> COUNSEL: Okay.
> THE COURT: Beyond whatever it may be.
> COUNSEL: No problem.
> THE COURT: Abandon this point.
> COUNSEL: No problem.
> THE COURT: You've stepped far enough into the swamp.
> Let's get out of it.

(*Id.* at 15077.) Counsel then moved on to other argument. To the court's amazement, he proceeded to inject his own testimony into the argument by returning once again to the "facts" of the Ford incident, telling the jury that his client was in trial "because the guy just doesn't like torturing women. And that's why he's sitting here." (*Id.* at 15079.) He also offered to the jury, with no evidentiary support, "That's a working man over there who makes spas and sells spas." (*Id.* at 15081.)

The court highlights these comments, not to unnecessarily call into question the propriety of defense counsel (although some questionable behavior was evident as noted above), but rather to provide context to the Government's rebuttal.

The court generally allows argument to proceed uninterrupted and, consistent with the standard jury instructions on this point, entrusts to the jury the responsibility of determining whether the argument is or is not supported by facts in evidence. Generally, therefore, the court does not inject itself into arguments. That the court felt it necessary to do so a number of times in this case the court believes to be a measure of the volatility and tension generated by such a lengthy trial.

In the court's view, in general, the defense presented closing arguments which were coordinated, often inflammatory, sometimes incorrect on the law, too often misleading on the facts, generally encouraging of jury confusion, and arguably suggesting nullification with respect to the Box Canyon events.

Throughout, the defense arguments imputed unethical and improper conduct undertaken by or on behalf of the Government. In other words, the defense set the table and established the tone for the rebuttal that their arguments invited.

"The prosecution necessarily has 'wide latitude' during closing argument to respond to the defense's strategies, evidence and arguments." *Wogenstahl v. Mitchell*, 668 F.3d 307, 329 (6th Cir. 2012) (quoting *Bedford v. Collins,* 567 F.3d 225, 233 (6th Cir.2009))). Further, "[t]he propriety of the prosecution's closing argument depends on the circumstances of the case and 'what the defense has said or done (or likely will say or do).' *Id.* (quoting *Bedford*, 567 F. 3d at 233). Indeed, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young*, 470 U.S. 1, 11 (1985). It may well be that the closing argument of the defense invited the alleged improper comments of the prosecution. *Id.* (citing *Lawn v. United States,* 355 U.S. 339 (1958)).

That is exactly what happened in this case. The statements by the Government now challenged by the defense were invited by the argument, tone, and theme set by defense counsel in their arguments. The court is not here called upon to find that any defendant's attorney stepped outside the bounds of ethical advocacy in argument, but has no doubt that presenter very aggressively pursued a theme of Government impropriety, and made other (hopefully unintentional) misstatements or missteps in closings which invited a proportional and corrective response from the Government. In so holding, the court notes again that this trial was a particularly acrimonious litigation. It lasted four months, punctuated with countless disputes, objections, motions, allegations of discovery violations and sandbagging, and the like. Vigorous advocacy was advanced by all counsel. As trial wrapped up with closing arguments, it is not surprising

that tensions were high and that closing arguments would become unusually heated. The court's comments on the tone and missteps of defense counsel do not hold that counsel on either side impinged on any defendant's right to a fair trial or in any way negatively impacted a Defendant's due process rights. The trial, and the argument, was not compromised. Nonetheless, the Government's challenged comments must be viewed in the context of the hours of unusually aggressive closing arguments presented by defense counsel.

## 2. Analysis

### a. Did the Government Personally Denigrate Defense Counsel?
### Answer: No.

Defendants first argue that the Government engaged in a flagrant pattern of denigrating the defense counsel such that the defendants were denied a fair trial. But characterizations do not amount to denigration. At most, the Government characterized the defense counsel's argument during their closings, accurately stating that some of the defense counsel confused the issues, misdirected the jury, or otherwise obfuscated the task at hand. Given some of the inaccurate or misleading arguments noted above, this line of argument was reasonable. The Government accurately gives context to the challenged statements in its response brief. (Dkt. # 1380 at PageID 16364-16367.) In sum, the Government's discussion of the closing argument of counsel for Vandiver, Sutherland, and Drozdowski was entirely proportionate. Further, while it is true that the Government used the words "nasty" and "nuts" when discussing Drozdowski's counsel's argument, the Government did *not*, as Defendants suggest, directly call counsel those names. Instead, the Government stated:

> Mr. Machasic's closing arguments[,] complete with the necessary nasty tones and accusations against the Government's alleged overreach[,] was more notable about what he did not say rather than what he did say. He put the Government on trial.

(Dkt. # 1234 at PageID.15239.)  The Government did not say counsel was "nasty;" it said he used nasty tones.  Further, the Government did not say counsel was "nuts." It said that it drove counsel nuts when the Government would show a photograph of his client.  (*Id.* at 15240.) Both of these statements, based on Drozdowski's closing argument itself, are not unfair characterizations.

"Defense counsel, like the prosecution, is to avoid personal attacks on the prosecutor and 'avoid acrimony in relations with opposing counsel during trial.'" *Wogenstahl v. Mitchell*, 668 F.3d 307, 330 (6th Cir. 2012) (quoting *Young,* 470 U.S. at 10). In *Wogenstahl*, the Sixth Circuit noted defense counsel's "strident" suggestion of impropriety by the prosecution, thus setting an "overall tone of the closing arguments was one of extremely zealous advocacy, accurately described as unpleasant." *Id.* Given that context, "the cited statements of the prosecution's closing do not appear to denigrate defense counsel inappropriately." *Id.*  Such is the case here.  The Government's rebuttal must be viewed in context.  The defense presented a theme of repeated accusations or implications regarding the Government's withholding or ignoring of allegedly exculpatory evidence and use of alleged perjured testimony and set the tone for aggressive closings.  The Government was entirely reasonable in its response.  The Government did not, in any manner, personally denigrate defense counsel.

### b.  Did The Government Refer To Defendants' Exercise Of The Fifth Amendment Right To Silence? Answer: No.

The Fifth Amendment of the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." Defendants argue that the Government impermissibly referred to the Defendants' invocation of this right. "It is well settled that direct reference by a prosecutor to a criminal defendant's failure to testify is a violation of the defendant's privilege against compelled self-incrimination." *Lent v. Wells*, 861 F.2d 972, 975 (6th Cir. 1988) (citing *Griffin v. California,* 380 U.S. 609 (1965)). When viewing the constitutionality of indirect references by the prosecutor to the defendant's failure to testify, the Sixth Circuit instructs that the court must examine four factors:

> 1) Were the comments 'manifestly intended' to reflect on the accused's silence *or* of such a character that the jury would 'naturally and necessarily' take them as such;
>
> 2) were the remarks isolated or extensive;
>
> 3) was the evidence of guilt otherwise overwhelming;
>
> 4) what curative instructions were given and when.

*Id.* (citing *Hearn v. Mintzes,* 708 F.2d 1072, 1077 (6th Cir.1983)). It is difficult to examine these factors in light of the challenged comments because it strains credulity to believe that the comments could have the meaning which Defendants attempt to attach to them. These statements do not remotely refer to the Defendants' silence, but rather are indicative of the Government's attempt to focus on the extreme strength of the evidence which had been presented—"through the number of individuals that came in and laid it all out: the good, the bad, and the ugly." (Dkt. # 1233 at PageID.15104.)

How this refers to the Defendants' invocation of the Fifth Amendment, the court is at a loss to understand.

Defendants challenge the Government's dispute of the "claim of right" argument. Defendant Smith contended that that Defendants had a claim or right to the motorcycles, and in rebuttal the Government pointed out that no one had testified in such a way to give any credence to this theory. Again, this is not commenting on Defendant's silence, but merely pointing to the record evidence, or the lack thereof, by highlighting the multiple club members who did testify regarding the motorcycles. Defendants next complain about a passing statement by the Government to "Defendants," plural on phone calls. During this portion of the rebuttal, Defendant Drozdowski's attorney objected because his client was not on any calls, the court stated that the Government could so acknowledge on this "minor matter," and the Government apologized, stating it would be more careful going forward. (*Id.* at 15135.) Again, this isolated and nearly immaterial comment does not impinge on the Defendants' invocation of the Fifth Amendment.

Finally, the statement that "[t]he Government did not pick these witnesses, . . . [t]he Defendants did," was again not a reference to the Defendants not taking the stand. Instead, the Government immediately followed this with an explanation that the witnesses were "chosen" from the Defendants' associates, friends, and fellow DDMC members. (Dkt. # 1234 at PageID 15197.) This statement (a common prosecutorial meme) was clearly intended to refute the Defendants' repeated argument that the Government carefully chose its evidence based only on what supported its theory of the case.

Defendants suggest that these comments evince a manifest intent to reflect on the accuseds' silence, but "[t]he court will not find manifest intent if some other explanation for the prosecutor's remarks is equally plausible". *Lent,* 861 F.2d at 975 (citing *United States v. Robinson,* 651 F.2d 1188, 1197 (6th Cir.1981)). Whether the jury would "naturally and necessarily" construe the comments to reflect on a defendant's failure to testify requires "a probing analysis" of the context of the comments, and the likely effect of the trial court's curative instruction. *Id.* Here, an analysis of the context of the comments reveals no manifest intent. Given further their isolated nature, the overwhelming evidence of guilt, and the fact that no curative instruction was even necessary (let alone requested), the court rejects Defendants' argument as unfounded.

### c. Did the Government Appeal To "Community Conscience" or Incite Jury Passions and Prejudices? Answer: No.

Next, Defendants contend that the Government appealed to the jury to be the "conscience of the community" and incited the jury's passions and prejudices by telling the jury that other juries had convicted similarly situated defendants. Specifically, Defendants take issue with the following line of argument:

> Is RICO conspiracy too difficult to understand, as Mr. Daly suggests? Tell that to the jury that convicted Mad Anthony for the RICO conspiracy. Tell that to Iron Mike, who pled guilty to RICO conspiracy. And tell that to the countless federal juries in the courthouse and across the nation.

(Dkt. #1234 at PageID 15217.) Mr. Daly objected, stating that there was no evidence about what happens in another court, the court sustained, stating "better to avoid in my opinion." The Government indeed moved on, explaining that Mr. Daly's argument was "insulting," and "that's the bottom line. And it was entitled to -- it was intended to rattle you to give up against -- give up and acquit Scotty Z of the serious charges that have

been lodged against him." (*Id.* at 15217-15218.) Indeed, given this context, it is clear that the Government was not, as Defendants suggest, appealing to the community conscience, but tying its argument directly to Sutherland's attorney's argument that RICO was simply too confusing and no one could make sense of it. As the Government said, just before the challenged statement,

> The glittering jewel of Mr. Daly's argument about his desire to avoid confusion doesn't make a lot of sense, incredibly, because basically he says the RICO conspiracy law is too confusing. It's too complicated. No one can understand it. Good luck, he says, and then he walks away, throws his hands up in the air. He did this to confuse you, to play on your emotions and concerns that this process is too hard.

(*Id.* at 15217.) The Government was tying its remark directly to a contention of Sutherland's attorney. This is not a situation like that presented in *Berger v. United States*, 295 U.S. 78, 85 (1935), where "[t]he prosecuting attorney's argument to the jury was undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury." Instead, the Government was simply refuting Sutherland's attorney's intimation that RICO was too confusing, that the jury could not possibly understand it. The Government's remark was narrow, fleeting, and not of any serious moment. The court rejects Defendants' argument.

### d. Did the Government Imply that Defense Counsel Knew that Defendants Were Guilty? Answer: No

Defendants contend that the Government implied, in the following statement, that Drozdowski's attorney knew he was guilty:

> And you know, it just drove Mr. Machasic nuts, every time we showed photos and addressed them in court, of course it does. He would love for that to go away. What am I talking about? The tattoos of the brass knuckle -- the brass knuckles, and the "talk shit" on the fists of David Drozdowski.

(Dkt. # 1234 at PageID 15240.) This statement, however, was clearly tied to Mr.

Machasic's argument during his closing which implied the Government had no reason to be showing the photograph of his client:

> The Government put up, in its closing argument, a picture of my client, and you've seen it many times now. They've put that picture up over and over again, my client holding sidearms. Said, look, he must have, he must have knowingly possessed that ammunition. He must have had that ammo. It must have been his ammunition. Okay? Rifle ammo, five rounds; shotgun shells; and a picture of sidearms. Don't be fooled by that trick. That was just an excuse for them to put up, yet again, that picture of my client holding sidearms. That ammunition does not fit sidearms.

(Dkt. #1232 at PageID 15949.)  The Government did not imply that Drozdowski's attorney knew he was guilty.  Defense counsel argued in his closing that it was a "trick" for the Government to show a picture of his client "over and over again."  The Government then flipped the argument back, defended its use of the photograph, and argued that defense counsel did not like the photograph because of the inference which could be drawn, by the jury, from the photograph.  The Government's argument was not improper.

### e.  Did the Government Introduce "Bad Character" Evidence Or Urge The Jury To Convict On The Basis Of Character Evidence?
### Answer: No

Also relying on the Drozdowski photographs, Defendants contend that the Government's use, and comments about the content, constitutes impermissible evidence of a person's character trait.  "A fundamental rule of evidence is that a defendant's 'bad character' cannot be used to argue that the defendant committed the crime for which he is being tried, or had the propensity to commit that crime." *Washington v. Hofbauer*, 228 F.3d 689, 699 (6th Cir. 2000) (citing Fed. R. Evid. 404(a) ("Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion....") (additional citations omitted)). "When a prosecutor dwells on a defendant's bad

character in this prohibited manner, [the court] may find prosecutorial misconduct." *Id.* (citing *Cook v. Bordenkircher,* 602 F.2d 117, 120 (6th Cir.1979) (noting that the "prosecutor's misconduct in this case is severe" due to his "persistent Ad hominem attack on the petitioner's character")). No such impermissible use was made here. The pictures of Drozdowski with firearms, with his brass knuckle tattoos, the fist tattoo stating "talk shit, get hit", and his excessively large rings were relevant to the charge of violent crime in aid of racketeering. This is particularly true given the testimony regarding the assault of McClure and the flesh that was in Drozdowski's ring. To the extent the photographs were prejudicial, their probative value outweighed any prejudicial effect.

The argument is without merit. The Government did not argue, citing these photographs or any other evidence, that Drozdowski or any of the Defendants were the type of people who would be involved in a RICO conspiracy. Instead, the Government argued, based on the properly admitted evidence, that the Defendants were guilty. And, with the exception of Defendant Sutherland, they were.

## IV. CONCLUSION

When looking at claims of prosecutorial misconduct, the court must analyzie disputed comments in the context of the trial as a whole and recognize that inappropriate comments alone do not justify reversal where the proceedings were "otherwise fair." *United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008) (quoting *United States v. Young,* 470 U.S. 1 (1985) and citing *United States v. Hitow,* 889 F.2d 1573, 1579 (6th Cir.1989) ("Even if certain comments are found to be inappropriate, they ... must be examined within the context of the trial to determine whether the

prosecutor's behavior amounted to prejudicial error.")). This requires the court to examine "defense counsel's conduct, as well as the nature of the prosecutor's response." *Young,* 470 U.S. at 12. Motions for mistrial will not be granted where "prosecutors have responded reasonably in closing argument to defense counsel's attacks, thus rendering it unlikely that the jury was led astray." *Henry*, 545 F.3d at 377 (citing *Young,* 470 U.S. at 12). After considering the context of the challenged comments, the court finds nothing improper in the Government's closing argument. The Government confined its argument to the facts in evidence, did not engage in improper attacks of defense counsel, and constrained its argument as required by the rules of evidence and the prosecutor's role as officer of the court. The trial, and the arguments, were heated. But the Government's arguments did not constitute prosecutorial misconduct. As such,

IT IS ORDERED that Defendants' Joint Motion for Mistrial Based Upon Prosecutorial Misconduct During the Government's Closing Rebuttal Argument. (Dkt. # 1240) is DENIED.

IT IS FURTHER ORDERED that Defendants' Joint Motion for New Trial Pursuant to Federal Rule of Criminal Procedure 33 (Dkt. # 1287) is DENIED.

 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated: November 2, 2018

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, November 2, 2018, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C3 ORDERS\11-20129.TrialGroup1.Mistrial.CHD.RHC.4.docx